**UNITED STATES of America, Appellee,**

v.

**Ralph ELKINS, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Silvio MONRABAL,
Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Eugene Tillmon CALHOUN,
Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Frank FUENTES, Defendant, Appellant.**

Nos. 84–1604, 84–1634 to 84–1636.

United States Court of Appeals,
First Circuit.

Argued May 6, 1985.
Decided Oct. 9, 1985.

Stephen J. Golembe, Miami, Fla., with whom Mishkin & Golembe, Miami, Fla., was on brief, for defendants, appellants.

Juan A. Pedrosa, Asst. U.S. Atty., San Juan, Puerto Rico, with whom Daniel F. Lopez Romo, U.S. Atty., Hato Rey, Puerto Rico, was on brief, for appellee.

Before CAMPBELL, Chief Judge, COFFIN and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

Defendants-appellants, the master and crew members of the M/V BLUE LIGHT, an American flagship vessel, appeal their convictions for, *inter alia,* aiding and abetting the possession with intent to distribute marijuana. 21 U.S.C. § 955a, 18 U.S.C. § 2. Appellants argue that their convictions should be overturned or a new trial granted as a result of: (1) the district court's denial of their motion to suppress the evidence seized from the M/V BLUE LIGHT, (2) the court's refusal to exclude or neutralize testimony commenting on appellants' silence and the invocation of the privilege against self-incrimination, and (3) the court's failure to adequately warn appellants of the inherent conflicts of joint representation 587 F.Supp. 964. As to three of the four appellants we find reversible error, and remand their case to the district court for retrial.

Appellants were on board the M/V BLUE LIGHT when it was sighted by the United States Coast Guard Cutter ESCAPE on the high seas, off the coast of the Bahamas. The ESCAPE, following its customary practice of conducting a document and safety check of all American flagship vessels on the high seas, tracked the course of the M/V BLUE LIGHT and within several hours closed upon the vessel. During that time the Coast Guard observed no suspicious behavior; the boat continued to travel in the same general direction, at the same speed, and responded to all radio contacts. The Coast Guard made physical contact with the M/V BLUE LIGHT nine miles from Key Santo Domingo, Bahamas and was given permission to board the boat for a document and safety inspection. Appellants willingly surrendered their documents, which were found to be in order.

The four appellants, Mr. Elkins, the master of the ship, Mr. Calhoun, and Mr. Fuentes, who are all American citizens, and Mr. Monrabal, who is a Cuban citizen, were the only persons on board the M/V BLUE LIGHT. Appellant Elkins stated that the boat and crew had set out from Bimini, Bahamas three or four days earlier, that they had been cruising around the Bahamas, and that they were on their way back to Miami, Florida. The ostensible purpose of the trip was to give appellant Elkins an opportunity to test the vessel to determine whether he wished to become its permanent master.

While the boarding party conducted a safety sweep of the boat, Mr. Elkins accompanied Lt. McCarthy, the boarding officer, on his inspection. Lt. McCarthy testified that he observed several potential safety hazards and peculiarities of the boat including what he believed to be a leak in the fuel tank. There was a pervasive odor of diesel fuel throughout the boat and puddles of fuel near the tanks. The cap to one fuel tank was missing and looked as if it had been improperly repaired. In addition, the fuel tanks were disproportionately large for a boat the size of the M/V BLUE LIGHT, and had numerous newly welded patches, some of which were man-sized. Lt. McCarthy also testified to the presence of mechanical and electrical equipment on the ship, the absence of fishing equipment on a fishing boat, and the fact that the boat was overstocked for such a short journey. Lt. McCarthy asked appellant Elkins about his observations and received straightforward, although generally uninformative, answers.

Lt. McCarthy stated, however, that Elkins became visibly nervous when he and the boarding crew decided to make a closer inspection of the fuel tanks. It was explained to appellant that this would involve sounding the fuel tanks to determine the amount of fuel remaining in them, and if anything peculiar were found, the tanks

would be drilled. Appellant stated at that time that he did not want to answer any more questions and would "take the fifth".

Inspection of the over-sized tanks revealed two smaller tanks inside. Non-destructive drilling through these tanks indicated that marijuana was being stored in the innermost tank. Upon this discovery, now several hours after the initial boarding, Lt. McCarthy returned to the main deck, placed all of the appellants under arrest and read them their *Miranda* rights. Lt. McCarthy testified that the appellants did not look surprised.

Appellants were transferred to the ESCAPE and then to another Coast Guard cutter, the ALERT, which was headed towards San Juan, Puerto Rico. Appellants were held on board the ALERT during the six day journey to Puerto Rico where they made their initial appearance. Appellants were arraigned before the United States Magistrate in San Juan, consenting at that time to waive their rights to individual representation. Appellants were convicted after a three day jury trial in the district court of Puerto Rico and appeal from those convictions.

*Suppression Issues*

Appellants seek suppression of the evidence seized aboard the M/V BLUE LIGHT on three grounds. First, they argue that the M/V BLUE LIGHT was impermissibly stopped by the Coast Guard within the territorial waters of the Bahamas. They claim that the boat, although outside the three-mile territorial limit which the United States recognizes for Bahamian waters, was well within the twelve-mile territorial sea which the Bahamas claims for itself. The Coast Guard has statutory authority to stop, board and search vessels found only within the "customs waters" of the United States, 19 U.S.C. § 1581(a), upon the "high seas[,] and [in] waters over which the United States has jurisdiction ...", 14 U.S.C. § 89(a). Because the "customs waters" extend only twelve nautical miles from the United States coast, 19 U.S.C. § 1401(j), (unless extended by treaty, *see United States v. Romero-Galue*, 757 F.2d 1147 (11th Cir.1985)), and the "high seas" by definition includes only those waters "beyond the territorial seas of any foreign nation", 21 U.S.C. § 955b(b), the Coast Guard, they contend, was without jurisdiction to stop the M/V BLUE LIGHT.

Appellants assumed throughout the proceedings below that the M/V BLUE LIGHT was stopped on the high seas and consequently they never raised this issue before the district court. Appellants therefore waived their rights to a review on the merits of this and all other claims which rely on allegations that the M/V BLUE LIGHT was stopped in Bahamian territorial waters.

Appellants next challenge the district court's denial of their motion to suppress on the ground that the Coast Guard was not authorized to stop the M/V BLUE LIGHT or search it for contraband because the Coast Guard had no articulable reason to suspect criminal activity. This claim is without merit.

■ First, we have repeatedly stated that under 14 U.S.C. § 89(a)[1] the Coast Guard may "stop and board an American flag vessel on the high seas without a warrant and without any particularized

---

1. 14 U.S.C. § 89(a) provides, in relevant part: "The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken...."

suspicion of wrongdoing" to conduct an administrative safety and document inspection. *United States v. Burke*, 716 F.2d 935, 937 (1st Cir.1983); *United States v. Hilton*, 619 F.2d 127, 131 (1st Cir.1980). The evidence is undisputed that the Coast Guard in this instance stopped and boarded the M/V BLUE LIGHT for just those purposes.

■ The only question, therefore, is whether the Coast Guard went beyond its statutory authority and violated the Fourth Amendment by conducting the more extensive search which revealed the cache of marijuana. Government officers who are otherwise authorized may search a vessel on the high seas if they have reasonable and articulable grounds for suspecting that it is engaged in criminal activity. *United States v. Green*, 671 F.2d 46, 53 (1st Cir. 1982); *United States v. Williams*, 617 F.2d 1063 (5th Cir.1980). The government argues that the safety check triggered a "reasonable suspicion" that the boat might contain contraband.

As we recognized in *United States v. Arra*, 630 F.2d 836, 843 (1st Cir.1980), it is standard practice, authorized by federal regulation, to check for fuel leaks and accumulations when boarding a vessel. The government, therefore, initially had "a legitimate safety regulatory interest", *id.*, in inspecting the fuel tanks. Once the boarding crew saw the leakage, the oversized tanks, the crude man-sized patches on the tanks, and other odd features, we believe that it had "reasonable and articulable grounds for suspecting" criminal activity. *United States v. Green*, 671 F.2d at 53. This suspicion justified the transfer of fuel between the tanks and the exploratory drilling which exposed the marijuana. No violation of the Fourth Amendment occurred.

■ Finally, appellants argue that the evidence obtained by the boarding crew prior to their formal arrest must be suppressed due to the government's failure to comply with the requirements of Rule 5(a) of the Federal Rules of Criminal Procedure. *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) (a confession made during a period of unnecessary delay in complying with the requirement that the defendant be taken before a magistrate is inadmissible at his trial); *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). Rule 5(a) provides that:

> "any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate...." Fed.R.Crim.P. 5(a).

Appellants claim that they were "effectively" arrested once they were detained by the Coast Guard during the inspection of the M/V BLUE LIGHT, and that their arraignment was unnecessarily delayed because the Coast Guard transported them to Puerto Rico rather than to southern Florida, the nearest port of entry in the United States. They argue that, under *McNabb* and *Mallory*, this period of unnecessary delay requires suppression of all evidence seized from the time appellants were taken into custody, and not merely of evidence obtained during the actual period of delay.[2] We disagree.

■ Appellants offer no support for their assertion that the rule of *McNabb* and *Mallory* requires suppression of evidence lawfully obtained *prior* to any period of unnecessary delay, and our reading of those cases is to the contrary. Accordingly, we concern ourselves only with evidence seized during the time of alleged delay. In this instance, the only possible period of unnecessary delay was the three days by

---

**2.** We note that a violation of Rule 5(a)'s prohibition against "unnecessary delay" does not automatically warrant suppression of the evidence seized during a period of delay. *Mallory* and *McNabb* must be read in conjunction with 18 U.S.C. § 3501(c) which provides that a confession made by a person under arrest or detention shall not be inadmissible solely because of delay in bringing that person before a magistrate if the confession is found to be voluntary. *United States v. Poole*, 495 F.2d 115, 124 (D.C.Cir.1974) (Leventhal, J., concurring); *United States v. Halbert*, 436 F.2d 1226, 1231 (9th Cir.1970).

which the journey to Puerto Rico exceeded the trip to Florida. Because appellants point to no evidence they seek to suppress which was seized during that period, or at any time after their formal arrest, we need not reach the question of whether there was, in fact, unnecessary delay as a result of the additional time it took to reach Puerto Rico.[3]

### Comments on Silence

Appellants next argue that their convictions must be overturned because the district court failed to exclude testimony during the trial commenting on the defendants' silence and their invocation of the Fifth Amendment privilege against self-incrimination. Appellants refer specifically to two incidents. In the first, Lt. McCarthy, the government's witness, testified on direct examination that after informing Elkins that he was going to take soundings of the fuel tanks and that he might then drill them, the appellant "became visibly nervous. He told me that he didn't want to answer any more questions and that he would, quoted [sic], take the fifth." Defense counsel immediately objected. The court overruled the objection, but shortly after gave this cautionary instruction:

> "Let me inform the jury. When a person takes the Fifth Amendment, you are to draw no adverse inference from that. Every person has the right to plead the Fifth Amendment. You should take no adverse inference from the fact that the Defendant said I'm taking the fifth when asked by the Lieutenant about the tanks."

The second incident concerns Lt. McCarthy's testimony on direct examination that the appellants showed no surprise when placed under arrest and read their *Miranda* rights. Lt. McCarthy's characterization of the appellants' post-*Miranda* silence was referred to three additional times during the trial: first, when defense counsel cross-examined the witness on his statement; second, during the defendants' summation, when counsel warned the jury not to use the witness's characterization of the defendants as evidence against them; and finally, when the prosecutor on rebuttal summation stated "I submit ... that [the witness] stated ... there was no surprise. You can infer whatever you want from that." Defense counsel further noted his objection to the witness's comments on the defendants' post-*Miranda* silence in a motion to acquit. The court rejected defendants' argument, but nonetheless instructed the jury at the close of the trial that:

> "The law does not require a person in custody to make any reply whatever to any accusatory statement made to him or in his presence, either orally or in writing. So neither the accusatory statement nor any failure to make replies hereto is evidence of any kind against the accused. That is to say, neither the accusatory statement nor any failure to reply thereto can create any assumption or permit any inference of guilt."

Finally, after trial, the court addressed the argument based on the lieutenant's testimony and ruled that his "unsolicited comment about the demeanor of the defendants at the time of the search cannot be viewed as impermissible use by the Government of the silence of the accused."

We shall look first at Lt. McCarthy's testimony commenting on the defendant's invocation of the Fifth Amendment privilege against self incrimination. The Fifth Amendment provides that "[n]o per-

---

**3.** We reject as well appellants' argument that statements made prior to their formal arrest should be suppressed because they were taken into custody as soon as the Coast Guard boarded the vessel. It is well recognized that a routine inspection and boarding of an American flagship vessel on the high seas does not give rise to a custodial detention. *United States v. Magdaniel-Mora*, 746 F.2d 715, 723 (11th Cir. 1984); *United States v. Warren*, 578 F.2d 1058, 1070 (5th Cir.1978) (en banc) (*Miranda* warnings need not be given on a routine inspection on the high seas); *see United States v. Baker*, 641 F.2d 1311, 1319 (9th Cir.1981); *see also United States v. Lopez*, 709 F.2d 742, 745 n. 3 (1st Cir.1983). Although appellants were confined to one section of the boat during the lengthy Coast Guard inspection, we do not believe that this fact takes their case out from under this precedent.

son ... shall be compelled in any criminal case to be a witness against himself." Even if defendants were entitled to invoke the privilege against self incrimination prior to actual custodial interrogation, *but cf. Jenkins v. Anderson,* 447 U.S. 231, 240, 100 S.Ct. 2124, 2130, 65 L.Ed.2d 86 (1980) (defendant could be impeached on his prearrest, pre-*Miranda* silence because no governmental action induced the defendant to remain silent); *Roberts v. United States,* 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980), we believe that the effect of Lt. McCarthy's statement at trial was harmless beyond a reasonable doubt. Although the district court overruled defendant's objection on this point, the court promptly informed the jury to disregard the witness's statement during the trial, and then correctly instructed the jury on the defendants' right to remain silent at the close of the proceedings. Moreover, the incident was never referred to by counsel or the court and we cannot believe that it had any influence on the jury's deliberations.

Lt. McCarthy's second statement is more troubling. The exchange between the court, counsel and the witness is reproduced below.[4] The witness's first comment, which was objected to by defense counsel, referred to the witness's own feeling of surprise when one of the defendants asked for his medication. Whether or not this might be considered a comment on the post-*Miranda* responsiveness or lack thereof of only one of the defendants, it was soon made clear that what surprised the lieutenant was the lack of surprise on the part of all defendants upon their arrest on the stern deck of the M/V BLUE LIGHT. Immediately on being allowed to resume his testimony, Lt. McCarthy stated, "I placed them under arrest. It did not seem to phase them or give them any surprise." At this point defense counsel, having just unsuccessfully made the argument that the lieutenant's statement that the master showed no surprise impermissibly implied guilty knowledge by the defendants, undoubtedly felt that further objection would be futile. And at this point the court, even if it had earlier felt that counsel's objection did not apply to the lieutenant's testimony, must now have realized its applicability. From this point on both the prosecution and the court treated the objection as covering the lieutenant's testimony that defendants showed no surprise on being arrested. And so do we.[5]

Appellants rely on *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), to argue that Lt. McCarthy's statement constituted an impermissible reference to their silence in derogation of the Fifth and Fourteenth Amendments. *See also Miranda v. Arizona,* 384 U.S. 436, 468

---

4. "PROSECUTOR: After you finished with the arrest of the Defendants, what did you do with them?
WITNESS: We began preparation to get the boat secured and transported the Defendants to get back on the way and patrol some more. And the reaction of the prisoners, they knew they were under arrest.
As soon as they came back up on deck, I indicated to them, I have them under arrest and the first thing he [Elkins] asks for was his high blood pressure pills. What is the name of the stuff they take, I was surprised at that.
DEFENSE COUNSEL: Objection.
COURT: What are your—approach the bench.
(Conference at bench.)
DEFENSE COUNSEL: Your Honor we object to that, he being a Lieutenant.
COURT: What specifically do you have objection to?
DEFENSE COUNSEL: He said this was a surprise to him. He stated there was no surprise to the Master, being arrested.

COURT: That you—
DEFENSE COUNSEL: He implied consistently that they knew.
COURT: Well, I overrule your objection.
DEFENSE COUNSEL: That is a typical statement of opinion, he already told you that he found marijuana.
COURT: That is his impression. I think he can testify on his impression, that it was, he thought he was surprised, and he admitted that. Continue.
(In open Court, before the Jury.)
WITNESS: (continuing) I placed them under arrest. It did not seem to phase them or give them any surprise. They were concerned about the things that they would take back to the ESCAPE with them...."

5. Despite the lacunae, incomprehensible transitions, and ambiguous referents in the computerized transcript, we feel confident that we have interpreted its contents fairly.

n. 37, 86 S.Ct. 1602, 1624–25 n. 37, 16 L.Ed.2d 694 (1966). In *Doyle,* the Supreme Court ruled that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619, 96 S.Ct. at 2245. The Court reasoned that silence in the wake of the *Miranda* warning is "insolubly ambiguous" and may reflect only the defendant's reliance on the rights just read to him. It would therefore be

> " 'fundamentally unfair' simultaneously to afford a suspect a constitutional right to silence following arrest and yet allow the implications of the silence to be used against him.... *Doyle v. Ohio,* 426 U.S. 610, 619 [96 S.Ct. 2240, 2245, 49 L.Ed.2d 91] ..." *United States v. Shaw,* 701 F.2d 367, 381 (5th Cir.1983).

The district court, in its opinion denying a motion for new trial, characterized the lieutenant's testimony as his "observations as to the demeanor" of defendants and found it admissible as describing acts inconsistent with innocence. As justification for its holding that the Fifth Amendment was not implicated, it cited *United States v. Nabors,* 707 F.2d 1294 (11th Cir.1983). But *Nabors* involved comment on pre-arrest silence, this fact being noted by the court in distinguishing it from *Doyle. Id.* at 1298.

*Doyle* cannot be avoided simply by treating testimony as to a defendant's non-responsiveness after receiving *Miranda* warnings as "demeanor" evidence. *Doyle* has been strictly applied so that any description of a defendant's silence following arrest and *Miranda* warning, whether made in the prosecutor's case in chief, on cross-examination, or in closing arguments, constitutes a violation of the Due Process Clause. *United States v. Shaw,* 701 F.2d at 382 (witness's statement that after reading defendant his *Miranda* rights he shook his head "no" was error); *see, e.g., United States v. Espinosa-Cerpa,* 630 F.2d 328, 335 (5th Cir.1980) (in prosecution of crewmen of vessel carrying drugs, arresting officer's testimony regarding crew's post-*Miranda* silence was error); *United States v. Whitaker,* 592 F.2d 826, 830–831 (5th Cir.1979) (customs officer's comment at trial that "For all practical purposes they [defendants] made no statements" found to be error); *Booton v. Hanauer,* 541 F.2d 296, 298–99 (1st Cir.1976) (state's witness improperly referred to defendant's refusal to answer questions); *see also United States v. Daoud,* 741 F.2d 478, 480–481 (1st Cir.1984) (error for prosecutor to elicit comment on defendant's post-*Miranda* request for counsel). A *Doyle* violation occurs not only when the objectionable comments explicitly refer to a defendant's failure to answer questions put to him or her, but when the reference to defendant's silence is more oblique. In the latter case the nature of the statement and the context in which it was offered must be examined to determine the presence of error.

In *United States v. Shaw* the Fifth Circuit analyzed three instances of prosecutorial comment on the defendant's silence. In the first, the witness stated:

> "After I read him the *Miranda* rights I asked him did he want to talk to us now and he put his head in a down position and shook it 'no', and never did say a word." 701 F.2d at 381.

The court found that this remark, "even though unsolicited and couched in narrative terms, ... did constitute an improper comment upon silence as envisioned in *Doyle.*" *Id.* at 382. In the next, the prosecutor asked the defendant whether, upon being shown the bullet and gun, "[y]ou just hung your head, didn't you?". The court found this to be a proper comment on silence within the context of the trial because it was offered to rebut the inference of cooperation with the authorities just drawn by defendant on his direct testimony. *Id.* at 384. Finally, another witness testified that during questioning of the defendant, the defendant "dropped his head and covered up his face and just sat there for a minute" after being told that the child victim had just died. The court reasoned that this remark did not impermissibly comment on

the defendant's right to silence following arrest because it occurred during an interview voluntarily submitted to by the defendant. Where the defendant had not invoked his Fifth Amendment right to remain silent, a comment on his demeanor had no ambiguity attached to it. *Id.* at 385. Moreover, the court concluded, even if death were accidental as defendant alleged, "a few moments of speechless silence upon hearing of the death would be a normal reaction" and not necessarily a guilty one. *Id.*

■ In the context of the present trial there can be no doubt that Lt. McCarthy's statement, although arguably evidence of the defendants' demeanor, invited the jury to infer guilty knowledge from the defendants' failure to respond. In contrast to the last statement made in *United States v. Shaw*, we can hypothesize no plausible alternative interpretation for Lt. McCarthy's testimony which might cure its effect upon the jury. The statement was not offered to rebut the defendants' testimony nor was it deemed to be a characterization of the defendants' subsequent waiver of their Fifth Amendment rights. The defendants' had just moments before been read their *Miranda* rights and the record suggests that at no time did they relinquish their right to remain silent. Therefore, whether or not Lt. McCarthy's statement was descriptive demeanor evidence, we find that it none-

theless was an impermissible comment on the defendants' right to remain silent.

We therefore hold that the court's refusal to strike the lieutenant's testimony regarding defendants' lack of surprise was error. Our inquiry, however, does not end here. This holding requires us to scrutinize the evidence to determine whether the constitutional error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ The evidence of guilt with respect to the engineer, Fuentes, and the two "hands", Calhoun and Monrabal, was not very strong, especially because of the lack of evidence with respect to these defendants' culpable knowledge. There was no evidence in the record as to when the marijuana was taken aboard the boat or that these defendants helped to load it. It was well concealed and gave off no odor, and it is therefore possible that they were unaware of its presence. There was no evidence of these defendants' prior involvement with drugs, or of their relationship with the master or the owner of the boat. There was no evidence of any statements made by them, no incriminating evidence found on or near them, and no fingerprints. The fact that they had been on the M/V BLUE LIGHT, a forty-six foot boat, for three or four days, together with the presence of oversized tanks and other facts we have noted, might constitute sufficient evidence to support a verdict of guilty,[6] but

---

**6.** While the factors highlighted by our dissenting brother might persuade us to hold that there was sufficient evidence, such a decision in itself would be a close one. On the one hand, we would face a line of decisions in which courts have found evidence insufficient to support a verdict of guilty when the government has shown only that crew members were present on a boat carrying marijuana preceding and at the time of arrest and that they worked for a master who was involved in importing or distributing marijuana. *See, e.g., United States v. Bland,* 653 F.2d 989, 996–97 (5th Cir.1981) (relying on presence preceding and at the time or arrest has never been sufficient to sustain conviction); *United States v. Willis,* 639 F.2d 1335, 1338 (5th Cir.1981) (marijuana concealed, no odor detected, only evidence was crew members' mere presence), *reh'g denied,* 646 F.2d 189 (5th Cir. 1981) (government ignored burden of introduc-

ing some evidence indicating that crew members knew their ship was carrying marijuana); *United States v. Mehtala,* 578 F.2d 6, 10 (1st Cir.1978) (overturned conviction because government's entire case consisted of crew member's presence on ship throughout voyage and inferences of a close relationship with the captain); *United States v. Francomano,* 554 F.2d 483, 487 (1st Cir.1977) (reversed convictions of crew members because record was barren of evidence that they knew their ship was being used to import marijuana). *See also United States v. Cadena,* 585 F.2d 1252, 1267–71 (5th Cir.1978) (Skelton, J., dissenting). On the other hand, we would have available cases in which courts have found that factors such as the length of the voyage, the relationship between the crew members and the captain, and whether the contraband was perceptible, either by sight or smell, may support an inference of knowing

we would note that as to the crew members, the oversized freshly-welded tanks and the large supply of food would support at best a finding of guilty knowledge of some illicit venture, but not particularly one involving marijuana. But in any event, the question before us is whether we can be sure beyond a reasonable doubt that the lieutenant's description of them as not being surprised had no effect on the jury's verdict, *Chapman v. California,* 386 U.S. at 26, 87 S.Ct. at 829.

 This we cannot say. After the lieutenant's testimony was first admitted on direct examination by the government, it came in again on cross-examination by defense counsel, seemingly inadvertently.[7] In summation, defense counsel lamely argued that since Lt. McCarthy had not previously known defendants, he could not determine whether they were surprised or not.[8] The prosecutor, as he approached the end of his summation, said:

"And what happened when Lieutenant McCarthy went on top and said he had found THC, marijuana, were they surprised, I submit to you that he stated, the evidence stated there was no surprise. You can infer whatever you want from that."

This testimony, repeated throughout the brief trial, was the only direct evidence of defendants' guilty knowledge, and may well have been the final and necessary straw leading to conviction. Thus, in view of the absence of any "overwhelming" evidence of guilt, we are unable to conclude that the references to these defendants' silence were harmless beyond a reasonable doubt.[9] Moreover, we cannot say that the court's general instruction to the jury at the close of the trial that the silence of a defendant in custody may not be considered as evidence of guilt adequately cured the effects of the repeated *Doyle* violation.[10] We therefore reverse the judg-

participation by crew members. *See e.g., United States v. Michelena-Orovio,* 702 F.2d 496 (5th Cir.1983) (strong odor, 5-day voyage, 12 tons of marijuana on 75-foot boat, running lights reversed, crew members concealed identity of captain); *United States v. Bent,* 702 F.2d 210 (11th Cir.1983) (2- to 4-day voyage, 8 crew members, 6,520 pounds of marijuana, 60-foot boat, marijuana in various places on boat, evidence of recent offload of marijuana); *United States v. Martinez,* 700 F.2d 1358 (11th Cir.1983) (13 crew members, 75-foot boat, 13 tons of marijuana, strong odor); *United States v. Mazyak,* 650 F.2d 788 (5th Cir.1981) (19-day voyage, 14,611 pounds of marijuana, close relationship between captain and crew, crew member's misidentification of himself, and letter linking captain and three crew members).

7. "DEFENSE COUNSEL: Isn't it true that when you told Mr. Elkins that you had found what you said was a substance that had given positive THC; isn't it a fact that he told you to let him see it?

· · · · ·

DEFENSE COUNSEL: You told him you found a substance that had given positive THC?
WITNESS: Yes, I did.
DEFENSE COUNSEL: And you said before that you didn't recognize the exact words?
WITNESS: Because of his reaction, the first reaction came out of the Gentleman, upon arrest was that of none [sic] surprise, and he

asked about his blood pressure pills, and the other Gentleman."

8. The "invited error" defense is not open to the government, because the prosecutor made the initial reference to the defendants' silence. *See United States v. Meneses-Davila,* 580 F.2d 888, 896 (5th Cir.1978).

9. *See United States v. Meneses-Davila,* 580 F.2d 888, 893 (5th Cir.1978) (reversible error found where prosecutor elicits fact and refrains from commenting on it again and the evidence of defendant's guilt was not overwhelming); *United States v. Johnson,* 558 F.2d 1225 (5th Cir. 1977) (comments on defendant's silence encouraged jury to believe that defense of lack of knowledge was fabricated after arrest, and constituted reversible error); *United States ex rel. Ross v. Fike,* 534 F.2d 731 (7th Cir.1976) (in absence of overwhelming evidence of defendant's guilt, questioning and argument of state's attorney concerning defendant's silence was reversible error); *Scarborough v. Arizona,* 531 F.2d 959 (9th Cir.1976) (prosecutor's comment in his opening statement suggesting that defendant's guilt could be inferred from his silence at the time of arrest was reversible error in light of the presence of some evidence upon which the jury could have acquitted defendant). *See also Hawkins v. LeFevre,* 758 F.2d 866 (2d Cir.1985).

10. *See United States v. Johnson,* 558 F.2d at 1230; *United States ex rel Ross v. Fike,* 534 F.2d at 734.

ment as to these three defendants and remand their cases to the district court for a new trial.

The same, however, cannot be said for the master, Elkins; the evidence of guilt with respect to him is very strong. First, it challenges credibility to believe that the owner of the M/V BLUE LIGHT would entrust his or her boat loaded with $3,200,000 of marijuana to a master who was oblivious to the value and nature of the cargo. The jury could properly infer that a master is aware of the nature of the cargo that he had in charge.[11] Second, Elkins's story was discredited through the testimony of Lt. McCarthy. Elkins's first statement to Lt. McCarthy that he was just testing the boat was inconsistent with the issuance of a permit more than three months earlier designating him as master of the M/V BLUE LIGHT. His subsequent statement that the boat was used for fishing conflicted with the absence of any fishing gear and was hardly repaired by his comment that the gear had been lost overboard. And, especially in view of Elkins' over three-month tenure as master, his professed lack of knowledge about the oversized tanks or their capacity, the presence of fresh welds, the evidence of recent construction, and the large stocks of food (for a supposedly short journey)—all pointed to his guilty knowledge. We do not see how testimony that Elkins registered no surprise on being arrested could have prejudiced his case. The error of admitting such testimony was harmless beyond a reasonable doubt. For cases in which *Doyle* violations were found to be harmless error, *see, e.g., United States v. Espinosa-Cerpa,* 630 F.2d at 334–335 (witness's statements were isolated and unsolicited by the prosecution, the comments did not undermine any exculpatory defense, the court gave a curative instruction, and there was over-

whelming evidence of guilt from the circumstances of appellant's arrest); *United States v. Whitaker,* 592 F.2d at 830–831 (prosecutor did not focus on or highlight witness's reference to silence, judge gave cautionary instruction, overwhelming evidence of guilt); *see also Booton v. Hanauer,* 541 F.2d at 299 (prosecutor did not comment directly or indirectly on reference to silencem, judge gave cautionary instruction, and overwhelming inference of guilt could be drawn from admissible evidence); *United States v. Caro,* 637 F.2d 869 (2d Cir.1981) (same evidence of defendant's silence could have been properly introduced to rebut defendant's testimony).

### Joint Representation

Appellants argue that both the district court and the magistrate failed to adequately advise them individually of the inherent conflicts of joint representation as we required in *United States v. Foster,* 469 F.2d 1 (1st Cir.1972). *See United States v. Bader,* 698 F.2d 553, 558 (1st Cir.1983); *United States v. Waldman,* 579 F.2d 649 (1st Cir.1978); *United States v. Donahue,* 560 F.2d 1039 (1st Cir.1977). This error was not harmless, they contend, because the joint representation of appellants at the trial level resulted in an actual conflict of interest.

Appellants were individually questioned by the magistrate who presided at their arraignment as to their desire to retain joint counsel. He admonished them to advise counsel of any conflicts of interest that might arise as a result of their joint representation. Appellants at that time willingly signed forms acknowledging their decision to be jointly represented. At trial, the court inquired of appellants' counsel whether they had agreed to joint representation. Counsel responded affirmatively

---

**11.** *United States v. Bland,* 653 F.2d 989, 996 (5th Cir.1981); *United States v. Sanchez,* 634 F.2d 938, 942 (5th Cir.1981); *United States v. Willis,* 639 F.2d 1335 (5th Cir.1981). Despite the comments of the dissent to the contrary, *see infra,* p. 543, courts do uphold a master's verdict of guilty but reverse that of a crew member merely because the jury could properly infer that the

master of a vessel is aware of the nature of his cargo, whereas a crew member is not. *See, e.g., United States v. Bland,* 653 F.2d 989 (5th Cir. 1981) (affirming conviction of master but reversing as to crew members); *United States v. Willis,* 639 F.2d 1335 (5th Cir.1981) (affirming as to master but reversing as to crew members).

and the court made no further inquiry of appellants.

 Joint representation does not necessarily adversely affect a defendant's Sixth Amendment right to effective assistance of counsel, *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), but because it might have adverse consequences in certain circumstances, Rule 44(c) was enacted in 1979 to require the court to inquire personally into every case of joint representation of multiple defendants to advise each of his right to separate counsel. Rule 44(c) concludes:

> "Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel."

Several years prior to the enactment of Rule 44(c), we adopted the supervisory rule in *United States v. Foster* requiring the district court to go even further to ensure that a defendant's waiver of the right to separate counsel is knowing and voluntary. 469 F.2d at 5. Under *Foster*, the trial court is instructed to warn on the record every defendant who seeks to be jointly represented of the inherent risks of multiple representation. *Id.* at 4–5; *United States v. Martorano*, 620 F.2d 912, 914–915 (1st Cir.1980). Whenever adequate warning is not given, we have imposed on the government the burden of showing "it is more likely than not that no prejudice stemmed from the joint representation." *Id.* at 915–916. Prejudice will be established if it can be shown first, that there exists an alternative defense strategy available to defendants, and second, that the strategy poses the potential for conflict of interest between them. *Id.* at 916.

 We are not fully satisfied that the colloquy conducted by the magistrate and the action taken by the district court satisfied the requirements of our supervisory rule. Without presuming to prescribe the words to be spoken by the district court in these circumstances, we nevertheless believe that our supervisory rule requires the court to give the lay person some under-

standing of the nature of the possible conflicts of interest that might arise in multiple representation situations. The appellants could have been warned, for example, that joint representation might lead to a conflict of interest if the decision to adopt a unified defense precludes the introduction of evidence which is exculpatory as to one defendant because it is damaging to the others. This would be a particularly appropriate warning in this case where the relationship of the crew members to the master and owner of the ship might reveal different levels of knowledge and culpability. However, because the record does not support appellants' assertion that a real conflict of interest existed in this case, these defects are not fatal to the government's case.

Appellants did not testify at trial. However, they offered the unified defense that they were unaware of the presence of the marijuana on the boat because it was hidden in the fuel tanks. On appeal they argue that at least appellant Monrabal, unlike the other crew members, had no prior drug convictions and could have taken the stand to show that he was unaware of the contraband. As the government points out, there is nothing inherently prejudicial to the other defendants in such testimony. But even were there a possibility of prejudice, appellants have offered no concrete evidence that Monrabal would have been able to present a viable defense; there is no evidence before us, for example, that he wanted to testify, or that his relationship to the other defendants, to the owner of the boat, and to the boat itself, was so recently formed that he could not have had knowledge of, or participated in, the conspiracy charged. Appellants' total failure to proffer facts in support of their claim of conflict of interest simplified the government's task. We think that the evidence is clear that it is more likely than not that none of the appellants was prejudiced by their joint representation. Appellants' claim, accordingly, must fail.

In conclusion, for all of the reasons stated above, *the judgment of the district*

*court is affirmed as to appellant Elkins. The convictions of appellants Fuentes, Calhoun and Monrabal are reversed and their case is remanded to the district court for a new trial.*

TORRUELLA, Circuit Judge (dissenting).

Because I cannot agree that Lt. McCarthy's second statement was objected to in a timely fashion, or that any error thus allowed is plain error within the meaning of Rule 52(b) of the Federal Rules of Criminal Procedure, I am compelled to dissent. I also must differ with the manner in which the same factual circumstances are applied to two sets of defendants with different results.

The critical incident was as follows:

"PROSECUTOR: After you finished with the arrest of the Defendants, what did you do with them?

WITNESS: We began preparation to get the boat secured and transported the Defendants to get back on the way and patrol some more. And the reaction of the prisoners, knew they were under arrest.

As soon as they came back up on deck, I indicated to them, I have them under arrest and the first thing he [Elkins] asks for was his high blood pressure pills. What is the name of the stuff they take, *I was surprised at that.*

COURT: What are your—approach the bench. (Conference at bench.)

DEFENSE COUNSEL: Your Honor we object to that, he being a Lieutenant.

COURT: What specifically do you have objection to?

DEFENSE COUNSEL: *He said this was a surprise to him.* He stated there was no surprise to the Master, being arrested.

COURT: That you—

DEFENSE COUNSEL: He implied consistently that they knew.

COURT: Well, I overrule your objection.

DEFENSE COUNSEL: That is a typical statement of opinion, he already told you that he found marijuana.

COURT: That is his impression. I think he can testify on his impression, that it was, *he thought he was surprised,* and he admitted that. Continue.

(In open Court, before the Jury.)

WITNESS: (continuing) I placed them under arrest. *It did not seem to phase them or give them any surprise. They were concerned about the things that they would take back to the ESCAPE with them....*" (Emphasis supplied).

It is clear from this record that we are dealing with two separate "surprise" incidents. As to the first one, we are concerned with *Lt. McCarthy's* surprise, *not* the defendants'. It was to this statement that defendants' counsel objected. Thereafter, Lt. McCarthy continued testifying and it was then that he made the "impermissible" comment to the effect that placing them under arrest "did not seem to phase them or give them any surprise." *No objection was made by counsel to that statement.* We could engage in all sorts of speculation as to why this was not done but it would not change the record.

To this we should add several important circumstances surrounding this testimony. This "suprise" statement is rather innocuous, particularly when considered in the context of the rest of Lt. McCarthy's statement to the effect that "[t]hey were concerned about the things they would take back to the ESCAPE with them." Lt. McCarthy's statement was made during a narrative description of the events, following the arrest of the defendants, and was not elaborated upon nor elicited by the prosecution. Thus, standing alone, it can hardly be labeled a flagrant attack on defendants' *Miranda* rights, especially in view of the court's repeated instructions to the jury that the silence of a defendant in custody was not to be considered evidence of guilt. Under similar circumstances, even with timely objections by counsel, other courts have found *Doyle* violations to be harmless beyond a reasonable doubt. *See, e.g., United States v. Espinosa-Cerpa,* 630 F.2d 328, 334–35 (5th Cir.1980); *United*

*States v. Whitaker,* 592 F.2d 826, 830–31 (5th Cir.), *cert. denied,* 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1979); *Booton v. Hanauer,* 541 F.2d 296, 299 (1st Cir.1976); *United States v. Caro,* 637 F.2d 869 (2d Cir.1981).

Considering the record reproduced above, the majority's statement to the effect that "the [trial] court's refusal to strike the lieutenant's testimony regarding lack of surprise was error," is, with all due respect, inaccurate. As pointed out above, that statement is only applicable to the testimony relating to Lt. McCarthy's surprise. It is precisely because no objection was made to the second "surprise" incident that the trial court was not given the opportunity to correct any error that may have occurred. Thus, counsel's failure to object, apart from failing to preserve the error on appeal, also prevented the trial court from taking appropriate corrective action.

Even more disturbing is the majority's finding of harmless error with respect to Elkins, the master of the BLUE LIGHT, alongside the conclusion that such is not the case as to Fuentes, the engineer, and Calhoun and Monrabal, the two "hands." As to Elkins, the majority concludes that the evidence is very strong, but as to Fuentes, Calhoun, and Monrabal it is found that "the evidence with respect to the culpable knowledge of these defendants was not overwhelming." The logic behind this difference in results escapes me. To begin with, in a small, forty-six foot boat, at sea for several days, the distinction between master and crew tends to be somewhat blurred. The presence of huge fuel tanks (half the length of the vessel), the presence of fresh welds on these tanks, the evidence of recent construction, and the large stocks of food, which the majority finds "all pointed to the guilty knowledge of the master," could hardly have remained unobserved by the rest of the crew. As is correctly stated by the majority, "it challenges credibility to believe that the owner of the M/V BLUE LIGHT would entrust his or her boat loaded with $3,200,000 of marihuana to a master who was oblivious to the value and nature of the cargo." Credibility is equally strained, however, when one is asked to believe that, under the present circumstances, an owner would entrust such knowledge only to the master. If the jury below refused to believe such a story, I see no reason why we should give it any more credence. This court has in the past looked upon such claims with skepticism. *See United States v. Smith,* 680 F.2d 255 (1st Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). I agree that any error brought about by counsel's failure to object was harmless beyond a reasonable doubt as to Elkins, but this is equally applicable to the other defendants.