**UNITED STATES of America, Appellee,**

v.

**Hector Luis LOPEZ ANDINO, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Israel MENDEZ SANTIAGO, Defendant, Appellant.**

**Nos. 86–1583, 86–1584.**

United States Court of Appeals, First Circuit.

Heard July 30, 1987.

Decided Oct. 28, 1987.

Francisco M. Dolz Sanchez, San Juan, P.R., for defendant, appellant Hector Luis Lopez Andino.

John T. Burns, by Appointment of the Court, for defendant, appellant Israel Mendez Santiago.

Frank D. Allen, Jr., Civil Rights Div., Dept. of Justice, with whom Jessica Dunsay Silver, Civil Rights Div., Dept. of Justice, Wm. Bradford Reynolds, Asst. Atty. Gen., Washington, D.C., and Jose A. Quiles, Acting U.S. Atty., Hato Rey, P.R., were on brief, for appellee.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

Defendants-appellants Hector Luis Lopez Andino and Israel Mendez Santiago, formerly members of the Puerto Rico Police, were convicted in district court of civil rights violations for assaulting and beating three men, one of whom died. Appellants make five arguments in challenging their convictions: (1) that the United States statutes under which they were convicted are inapplicable to Puerto Rico; (2) that their convictions violated the constitutional bar on double jeopardy because appellants previously had been convicted in Puerto Rico

Superior Court for their acts; (3) that their sixth amendment right to counsel was violated by their having been jointly represented; (4) that the jury was not properly instructed on the elements of the charged offenses; and (5) that the trial court erred by not instructing the jury on lesser offenses included in the offenses charged. We are not persuaded by any of appellants' arguments, and, therefore, we affirm their convictions.

## I. SUMMARY OF THE EVIDENCE

The government's evidence described an incident in which officers of the law brutalized three citizens. Two eyewitnesses, as well as the victims of the assault, testified to the following. At about 4:00 P.M. on December 19, 1982, Angel Carmona Ortiz and Juan Ramon Figueroa Serrano met with Ruben Padilla Rios in a field near a housing project in Bayamon, Puerto Rico. Padilla Rios had come there to buy drugs. As the meeting broke up, two police officers—appellant Lopez Andino, who was a sergeant, and Luis Ernesto Ortiz Maldonado—approached with revolvers in hand. The three men were forced to lie face down in tall grass, and Lopez Andino instructed Ortiz Maldonado to go and bring a third officer, appellant Mendez Santiago. When he returned with Mendez Santiago, Ortiz Maldonado was carrying a nightstick.

The officers then subjected the men to an ordeal of physical abuse lasting about thirty minutes. Lopez Andino and Mendez Santiago interrogated them, asking about whether they had drugs, and repeatedly beat them with the nightstick. The men also were forced to beat each other with the stick. Lopez Andino and Mendez Santiago kicked the men as they lay on the ground, and, at one point, these two officers jumped on Figueroa Serrano's back. Finally, the victims were told to walk deeper into the brush, and the officers left by another route.

Figueroa Serrano died the evening of the assault. According to the autopsy report, the cause of his death was severe thoracic abdominal trauma resulting from blows received to his thoracic and abdominal cavities.

The indictment charging the defendants had four counts. Count I was for violating 18 U.S.C. § 241 (1982)[1] by conspiring to injure, oppress, threaten, and intimidate the three victims of the assault in the exercise and enjoyment of their rights not to be deprived of liberty without due process, not to be subjected to summary punishment, and not to be compelled to be witnesses against themselves. It was alleged that the conspiracy resulted in the death of Figueroa Serrano. Count II was for acting under color of the law to deprive Figueroa Serrano of his rights, resulting in his death, in violation of 18 U.S.C. § 242.[2] Counts III and IV also were for violations of section 242 in respect to Carmona Ortiz and Padilla Rios. The trial lasted from April 21 through April 24, 1986. All three defendants were convicted on all charges. On Count I, Lopez Andino was sentenced to ninety-nine years imprisonment and Mendez Santiago to thirty years. Ortiz Maldonado was given a suspended sentence of twenty-five years on the same count. Each defendant was given concurrent sentences on the other counts.

1. Section 241 provides in pertinent part:
   **§ 241. Conspiracy against rights of citizens**
   If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or
   . . . .
   They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

2. Section 242 provides in pertinent part:
   **§ 242. Deprivation of rights under color of law**
   Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, ... shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.

## II. THE STATUTES' APPLICABILITY TO PUERTO RICO

■ Appellant Mendez Santiago contends that the United States statutes under which he was convicted, 18 U.S.C. §§ 241, 242, do not apply to Puerto Rico. We disagree. This court has held that section 242 is applicable to Puerto Rico. *United States v. Villarin Gerena*, 553 F.2d 723, 724–26 (1st Cir.1977). The reasoning expressed in *Villarin Gerena* regarding section 242 applies to section 241 as well. *See also United States v. Rivera Torres*, 826 F.2d 151, 155 (1st Cir. Aug. 14, 1987).

Just as we saw no reason to withhold from the people of Puerto Rico the protection section 242 affords against the misuse of official authority at the expense of citizens' rights, we see no reason to exclude the complementary statutory prohibition on conspiracies against those rights. We hold that the district court had jurisdiction to try appellants for the charged offenses.

## III. DOUBLE JEOPARDY

Appellant Mendez Santiago argues that the federal prosecution violated the constitutional proscription that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. According to the presentence investigation reports contained in the record, all three defendants had been convicted in Puerto Rico Superior Court on two counts of aggravated assault against Carmona Ortiz and Padilla Rios. The reports indicate that they also had been charged with first degree murder of Figueroa Serrano, but were found guilty on reduced charges of involuntary manslaughter. According to appellants, this was by way of guilty pleas. Appellants' sentences of imprisonment were suspended, and they were placed on probation by the superior court.

■ We note initially that "[s]uccessive prosecutions are barred by the Fifth Amendment only if the two offenses for which the defendant is prosecuted are the 'same' for double jeopardy purposes." *Heath v. Alabama*, 474 U.S. 82, 106 S.Ct.

433, 437, 88 L.Ed.2d 387 (1985). Separate statutory offenses with different aims, each requiring proof of a fact not required by the other, are not the same offenses for purposes of double jeopardy. *Brown v. Ohio*, 432 U.S. 161, 166, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187 (1977); *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *United States v. Christensen*, 732 F.2d 20, 23 (1st Cir.1984). Unlike the local law provisions regarding crimes against the person for which appellants previously had been convicted, a violation of section 241 occurs only if there was a specific intent to interfere with rights secured by the Constitution or laws of the United States, *see Anderson v. United States*, 417 U.S. 211, 223, 94 S.Ct. 2253, 2262, 41 L.Ed.2d 20 (1974), and section 242 has been violated only if there has been a willful deprivation of rights under color of law. Thus, it is not clear, although we do not decide, that the federal prosecutions were for the same offenses as were the Puerto Rico proceedings.

■ For the purposes of this appeal, however, it does not matter whether or not the local and federal prosecutions were for different offenses. According to the "dual sovereignty" doctrine, successive prosecutions are not prohibited by the fifth amendment if they are brought by separate sovereigns. As the Supreme Court recently described it, "[t]he dual sovereignty doctrine is founded on the common law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences'" and is subject to prosecution and punishment for both. *Heath v. Alabama*, 106 S.Ct. at 437.

The question before us, therefore, is whether Puerto Rico and the United States are "dual sovereigns" for double jeopardy purposes. Prosecuting entities are considered to be separate for double jeopardy purposes when they derive their power from different sources. *Heath v. Alabama*, 106 S.Ct. at 437; *United States v.*

*Wheeler,* 435 U.S. 313, 319–22, 98 S.Ct. 1079, 1083–85, 55 L.Ed.2d 303 (1978). It is well settled that when states enact and enforce their own criminal laws, they are acting pursuant to their own sovereign power, not that of the national government. *See United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922). Puerto Rico's status is not that of a state in the federal union, but, its criminal laws, like those of a state, emanate from a different source than the federal laws.

■ Although the legal relationship between Puerto Rico and the United States is far from clear and fraught with controversy, it is established that Puerto Rico is to be treated as a state for purposes of the double jeopardy clause. In 1950 Congress enacted legislation "so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption." Puerto Rican Federal Relations Act, Pub.L. No. 600, 64 Stat. 319 (1950). The purpose of the Federal Relations Act "was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union." *Examining Bd. of Eng'rs, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572, 594, 96 S.Ct. 2264, 2277, 49 L.Ed.2d 65 (1976). "Puerto Rico, like a state, is an autonomous political entity,...." *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 8, 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982). In *United States v. Benmuhar,* 658 F.2d 14, 18 (1st Cir.1981), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2927, 73 L.Ed.2d 1328 (1982), we held, treating Puerto Rico as a state, that a charge under Puerto Rico law for arson and the destruction of an insured building did not preclude a subsequent federal conspiracy prosecution, even though both were based on the same act.

The offenses for which appellants were prosecuted in superior court were against the Commonwealth, which for double jeopardy purposes is treated as a state. Therefore, the fifth amendment did not prohibit the federal prosecution.

## IV. JOINT REPRESENTATION

Each appellant argues that his representation by the same attorney that represented the other defendants deprived him of his constitutional right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. All three defendants were represented in district court by attorney Teodoro Mendez Lebron, who also represented one of the defendants in the local prosecution. Appellants claim that they were not sufficiently made aware of the risks of joint representation, and that this failure resulted in prejudicial error.

There are inherent risks involved when multiple defendants are represented by the same attorney. Federal Rule of Criminal Procedure 44(c) addresses these risks by requiring, in every case of joint representation, that the trial court ask about the arrangement and "personally advise each defendant of the right to the effective assistance of counsel, including separate representation." Unless the court concludes that "it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel." Fed.R.Crim.P. 44(c).

Even before the adoption of Rule 44(c), district courts in this circuit were required to take certain steps to ensure that multiple defendants sharing counsel were adequately represented. *United States v. Foster,* 469 F.2d 1, 4–5 (1st Cir.1972); *see United States v. Elkins,* 774 F.2d 530, 541 (1st Cir.1985). Our supervisory rule requires district courts to warn defendants of the risks of joint representation and to inquire whether they have discussed these risks with their attorney. Also, we have instructed the courts to inquire of defendants "whether they understand that they may retain separate counsel, or if qualified, may have such counsel appointed by the court and paid for by the government." *United States v. Foster,* 469 F.2d at 5. If adequate warnings are not given, the burden is on the government to show that no prejudice resulted from the joint representation. *Id.*

In this case, it was the government that first raised the potential problems of joint representation. The government filed a motion requesting the court to consider the possible conflict of interest posed by Mendez Lebron's representation of all three defendants. The court conducted a hearing, at which defendants and their counsel were questioned about their knowledge of possible conflicts. Each defendant was asked whether he was aware of the possibility that the interests of the other defendants would be pursued at his expense, and each responded that he understood this risk but insisted on having Mendez Lebron represent him. Each defendant said he understood that if he insisted on being represented by Mendez Lebron, and was convicted, he could not later raise the issue of joint representation.

The court also asked counsel whether they knew of any potential conflicts. Counsel for the government responded in the negative. Counsel for defendants also said he saw no conflicts. He told the court he had advised his clients of a number of problems with joint representation: that the government's case may not be equally strong against all defendants; that the strategy may be different than if each defendant had his own counsel; and that their counsel would be in a very bad position to entertain conversations with the government about one defendant testifying against the others. Mendez Lebron told the court he had even discussed these matters with defendants' families. He said that despite his warnings, all three defendants insisted that he represent them. Defendants told the court that they agreed with what their counsel reported.

In light of this, there is no basis for the assertion that the trial court failed to inquire into the risks of joint representation and make defendants aware of such risks. The record does not indicate, however, that defendants were advised that they had a right to separate representation, and that this could be provided at government expense if they qualified. Based on the court's inquiries about whether defendants wanted the same counsel, and defendants' insistence on having Mendez Lebron represent them, it could be argued that the court at least strongly implied that defendants were entitled to separate counsel. Nevertheless, because it is not crystal clear that defendants were made aware of the availability of separate counsel, we examine the probability of prejudice to defendants by the joint representation.

■ There is nothing to indicate that, although their present counsel have raised the matter, any of the defendants wanted to become a government witness, or that the government was willing to make such an arrangement. *Cf. United States v. Donahue*, 560 F.2d 1039, 1044 (1st Cir. 1977) (prejudice not improbable when one of the two defendants being jointly represented manifested a desire to testify on his own behalf, the evidence was weaker against him than against the other defendant, and he might have been able to divorce himself from his codefendant). As the government points out, Ortiz Maldonado, who apparently was the least culpable of the three officers involved, was in the best position to strike a bargain for his testimony, but he does not appeal.

According to Lopez Andino, defense counsel opted to try to get Ortiz Maldonado acquitted at the expense of himself and Mendez Santiago. It is possible, of course, that counsel representing multiple defendants could attempt to obtain an acquittal, or at least leniency, for one defendant by emphasizing the role played by another. But we have carefully reviewed the record and see no basis for concluding that counsel defended any one defendant less diligently than the others. The government's evidence, which included the testimony of two eyewitnesses, was very strong. Trial counsel vigorously cross-examined the government's witnesses, attempting to raise doubts about their ability to perceive and recall the events. He also put on witnesses in an attempt to raise a doubt about whether Figueroa Sorrano's death was the result of the beatings and thus obtain acquittals on the more serious charges of death resulting from the civil rights violations.

If an alternative defense strategy was available to defendants, and it posed the potential for a conflict of interest between them, prejudice would be established. *United States v. Elkins,* 774 F.2d at 541. It is possible to hypothesize such a strategy. Lopez Andino was the ranking officer at the scene. The evidence is that he sent Ortiz Maldonado to get Mendez Santiago and bring him to the field. Therefore, at least initially, Lopez Andino appeared to be initiating the incident. It is conceivable that the other defendants could claim that their subsequent participation was at the direction of Lopez Andino, and thus they were not willing participants in the conspiracy and did not have the intent necessary for a conviction. In view of the evidence, however, this scenario is purely hypothetical.

Because Ortiz Maldonado is not a party to this appeal, and Lopez Andino was the senior officer at the scene, Mendez Santiago would be the one logically to claim he was not a willing participant. The weight of the evidence, however, makes such a claim untenable. Among other incriminating evidence, there was testimony that Mendez Santiago beat Figueroa Serrano with the nightstick and jumped repeatedly on his back. In short, there is nothing in the record to indicate that a claim of unwilling participation would be something other than pure fabrication.

■ Unfounded speculation is not an adequate reason for concluding that appellants were denied their right to counsel. There would be cause for greater concern if the court had not conducted a hearing at which defendants insisted on joint representation despite being told that there were risks in such an arrangement. But "we must take care not to provide a windfall to a defendant, who has been found guilty of a serious crime, simply because of some attenuated hypothesis of prejudice woven by counsel after conviction. Joint representation, after all, may sometimes be quite beneficial to a defendant and may at other times be of little consequence to the adequacy of a defendant's representation." *United States v. Martorano,* 620 F.2d 912,

916 (1st Cir.), *cert. denied,* 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980). Although cautionary steps must be taken to protect a defendant's right to counsel, courts must allow defendants to choose joint representation when they know the risks involved and insist on it. We hold that defendants were not deprived of their right to counsel.

## V. THE JURY INSTRUCTIONS

■ Appellants raise two arguments regarding the jury instructions. The first is that the court failed to instruct the jury on the elements of the offenses with which defendants were charged. Although there was no objection by defense counsel, it is clear that such an omission would constitute plain error and require reversal. The origin of this contention, apparently, was a clerical error in the preparation of the record. According to the transcript initially prepared for this appeal, the charge contained no instructions on the elements of the offenses charged. In response to a motion by the government to correct the record pursuant to Federal Rule of Appellate Procedure 10(e), the district court held a hearing at which the court reporter said other instructions in addition to those in the transcript had been given but mistakenly not typed. A supplemental transcript was prepared, which contains detailed and accurate instructions on the offenses charged.

■ At oral argument, appellate counsel for defendants Lopez Andino and Mendez Santiago questioned whether the supplemental record was an accurate record of the jury instructions given. Counsel were given two weeks to file a supplemental brief and a copy of the transcript of the Rule 10(e) hearing. Despite the fact that they were filed late, we have read carefully the supplemental briefs, one of which contains as an appendix the transcript of the Rule 10(e) hearing. We find that the supplemental transcript is an accurate record of the jury instructions given at the close of the trial. Our finding is based on what was established at the Rule 10(e) hearing.

The court reporter stated that it was her custom to dictate her courtroom stenographic notes onto tape recorder cassettes which were given to a typist for preparing the transcript. She stated further that the cassette containing this portion of the charge, which was read to the jury by the judge from proposed instructions submitted by the government, were not transcribed. The court reporter said further that she did not proofread the transcript of the jury instructions and, therefore, did not realize any portion had not been transcribed. When the matter was called to her attention, she reread her courtroom notes and found the jury instructions that had not been transcribed. She then typed up the supplemental transcript of the charge with the instructions on the elements of the offenses included.

Mendez Lebron, trial counsel for the defendants, was at the Rule 10(e) hearing. He stated that he remembered the conference on jury instructions and that he informed the court he had no objections to the government's proposed instructions on the elements of the offenses. He also stated that he had "no doubt" that the court instructed the jury in accord with those instructions.

Assistant United States Attorney Flanagan stated that at the instructions conference the court denied the prosecutor's request for a lesser included defense instruction and then asked defense counsel if he had any objection to the government's proposed instructions. After defense counsel stated that he had none, the court said it would give them.

The trial judge was emphatic in stating that he remembered giving the instructions proposed by the government and that defense counsel had said at the instructions conference that he had no objection to them.

The court denied defense counsel's request to have the court reporter read the pertinent portion of her courtroom notes because she had stated that the supplemental transcript was an accurate transcription of her notes. The notes have been retained in the clerk's safe pending final disposition of the case.

Although there is a possibility, as appellate defense counsel argue, that the court reporter doctored the record, we think it extremely unlikely. This means that someone would have had to furnish her with a copy of the government's proposed instructions before she typed the supplemental transcript. There is nothing in the transcript of the Rule 10(e) hearing to suggest this. We also note that appellate defense counsel did not seek to question the court reporter at the hearing.[3]

■ Appellants' second argument regarding the jury instructions is that the court committed error by not instructing the jury on lesser included offenses. This argument founders on two grounds: first, trial counsel did not ask the court to instruct the jury on lesser included offenses; and two, he told the court, after the charge had been given, that he had no objections to it. Federal Rule of Criminal Procedure 30 requires the parties to raise objections to the instructions before the jury retires to consider its verdict.

A "defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973). A defendant, however, also is entitled to forgo the instruction for strategic reasons. *Look v. Amaral*, 725 F.2d 4, 9 (1st Cir.1984). In this case, the government wanted to have lesser included offense instructions given on Counts I and II, which charged that death resulted from the conspiracy and assault against Figueroa Serrano, but the court denied the request. The court may have concluded that defense counsel intentionally did not ask for such instructions in the hope that, if he raised doubt about whether Figueroa Serrano's death resulted from the assault, de-

---

**3.** In light of the trial judge's remarks to appellate counsel at the close of the hearing, we are constrained to state that, in our opinion, Attorney Dolz Sanchez pursued this matter properly and ethically.

fendants would be acquitted on Counts I and II, rather than convicted on lesser charges. Thus, the omission may have been the result of a strategic choice by defense counsel. In any event, the court did not err in not giving lesser included offense instructions when defense counsel had neither requested them nor objected when they had been omitted from the charge.

## VI. CONCLUSION

We hold that the statutes under which appellants were convicted are applicable to Puerto Rico, and that the court, therefore, had jurisdiction over appellants. Because Puerto Rico is a sovereign separate from the United States for purposes of double jeopardy, these prosecutions were not barred by prior convictions in Puerto Rico Superior Court. With respect to appellants' representation by the same counsel, even though the court's inquiry into the issue may have fallen short of what technically was required, no prejudice resulted from appellants having been jointly represented, and, therefore, any error would not suffice to upset the verdicts. Finally, we find no reversible error regarding the jury instructions or the district court's ruling that allowed the record to be supplemented with instructions that had been given to the jury but not typed initially as part of the transcript.

*Affirmed.*

TORRUELLA, Circuit Judge (concurring).

I concur in the result of this opinion and in most of its language, but cannot agree with certain portions of Part III which refer to the constitutional status of Puerto Rico. First, the statements contained in the objected section are unnecessary to reach the conclusion in this case, which I believe is otherwise correct. More importantly, the conclusion reached regarding Puerto Rico's sovereignty status for purposes of the double jeopardy clause is erroneous. If we were required to decide that

issue, I would be forced to vote that a double jeopardy impediment does exist to the federal prosecution.

The majority should and could have avoided the quagmire of Puerto Rican status litigation by limiting its discourse on double jeopardy to a ruling, as it tentatively indicates, *ante* p. 1167, that separate Puerto Rico/federal offenses are involved. It would have correctly concluded under *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), that the charges against appellants in the Commonwealth courts (aggravated assault and involuntary manslaughter, 33 L.P.R.A. §§ 4032(f), 4005 (1983 & Supp. 1986)), and those in this forum (conspiracy to violate civil rights and deprivation of rights under color of law, 18 U.S.C. §§ 241, 242 (1982)), involved "offenses ... requir[ing] proof of different element[s]," *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182. Thus the Puerto Rico/federal prosecutions do not implicate the double jeopardy clause.

The majority, unnecessarily to my view, has decided that no double jeopardy exists in this case because Puerto Rico is a "dual sovereign" with the United States for double jeopardy purposes. Such a conclusion is incorrect because Puerto Rico is *constitutionally* a territory, thus lacking that separate sovereignty which would allow consecutive Puerto Rico/federal prosecutions for what would otherwise be the same offenses. *See Puerto Rico v. Shell Co.,* 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1937).

Not the least of the majority's errors stem from the fact that it overlooks that the Puerto Rican Federal Relations Act (Pub.L. 600)[4] is merely an act of Congress. It is not a treaty, and certainly not a part of the Constitution. Thus, under well-established constitutional precedent, as an act of Congress it does not bind future Congresses. *Community–Service Broadcasting of Mid–America, Inc. v. Federal Communications Commission,* 593 F.2d

---

4. Pub.L. No. 600, 64 Stat. 319 (1950), allowed the people of Puerto Rico "to organize a local government pursuant to a constitution of their own adoption."

1102, 1103 (D.C.Cir.1978) (Skelly–Wright, C.J.) ("To be sure, Congress is generally free to change its mind; in amending legislation Congress is not bound by the intent of an earlier body. But it is bound by the Constitution."). Like any other act of Congress it may be repealed, modified, or amended at the unilateral will of future Congresses. Thus, as will be further discussed *post,* the *ultimate source of power* in Puerto Rico, even after the enactment of P.L. 600, is Congress, a situation which deprives Puerto Rico of the rudiments of sovereignty basic to the application of the "dual sovereignty" rule.

Although some events subsequent to the passage of P.L. 600 have tended to overlook and obscure the facts,[5] the legislative history of that Act leaves no doubt that even though its passage signaled the grant of internal self-government to Puerto Rico, no change was intended by Congress or Puerto Rico authorities in the territory's *constitutional* status or in Congress' continuing plenary power over Puerto Rico pursuant to the Territory Clause of the Constitution.[6] *See People v. Balzac,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901). In the hearings which culminated in the passage of P.L. 600, Antonio Fernós Isern, Puerto Rico's Resident Commissioner before Congress, expressly stated that the bill "would not

change the status of the island of Puerto Rico relative to the United States.... It would not alter the powers of sovereignty over Puerto Rico under the terms of the Treaty of Paris." *Hearings Before the House Committee on Public Lands on H.R. 7674 and S. 3336,* 81st Cong., 2d Sess. 63 (1950). He and Luis Muñoz Marín, Puerto Rico's senior statesman and driving force in seeking this grant of local autonomy, also expressed this interpretation of P.L. 600 by stating their understanding that Congress would retain authority to revoke or modify Puerto Rico's Constitution.[7] In accord with this view, the Secretary of the Interior, the Senate report accompanying the Senate version of P.L. 600, S. 3336, and the Senators who sponsored S. 3336 all explicitly stated that the new bill would not affect the underlying relationship between Puerto Rico and the United States.[8] Furthermore, the report accompanying the draft of the bill which became P.L. 600 also indicated that the measure did not change Puerto Rico's fundamental relationship to the United States. H.R.Rep. No. 2275, 81st Cong., 2d Sess., 3 (1950).[9]

After P.L. 600 was enacted, Puerto Rico drafted a constitution which was then presented by the President to *Congress* for approval. H.R.Doc. No. 435, 82d Cong., 2d Sess. (1952). In urging its approval Resident Commissioner Fernós testified before

5. Including our own decision in *Mora v. Mejías,* 206 F.2d 377 (1st Cir.1953), as well as the representations of our government to the United Nations' Committee on Information from Non-Self Governing Territories. *See* United Nations Document, A/AC 35/L.148.

6. U.S. Const. art. IV, § 3: "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory and other property belonging to the United States...."

7. Muñoz Marín testified regarding Congress' authority over the Puerto Rican Constitution that "Congress can always get around and legislate again." *See Hearings before the House Committee on Public Lands on H.R. 7674 and S. 3336,* 81st Cong., 2d Sess., 17–34 (1950). Similarly, Fernós Isern testified that "the authority of the Government of the United States, of the Congress, to legislate in case of need would always be there." *Id.* at 18. *See also Hearings before a Senate Subcommittee of the Committee on Inte-*

*rior and Insular Affairs on S. 3336,* 81st Cong., 2d Sess., 4 (1950).

8. The Secretary of the Interior testified that if P.L. 600 was passed there would be no change in "... Puerto Rico's political, social and economic relationship to the United States." *Id.* at 50. Senators O'Mahoney and Butler, the sponsors of S. 3336, stated that the bill would not affect the relationship of Puerto Rico with the United States. 96 Cong.Rec., 81st Cong., 2d Sess., 446 (1950). The Senate report which accompanied S. 3336 indicated that "[t]he measure would not change Puerto Rico's fundamental political, social and economic relationship to the United States." S.Rep. No. 1779, 81st Cong., 2d Sess., 3 (1950). The Senate approved S. 3336 without debate. 96 Cong.Rec. 8321 (1950).

9. The House Public Lands Committee approved H.R. 7644, which was identical to S. 3336. This draft became P.L. 600 thereafter and was signed into law by the President on July 3, 1950.

the House that "[t]his is a fundamental provision which emphasizes the fact that Puerto Rico continues to maintain its station within the United States political system." *Hearings before the House Committee on Interiors and Insular Affairs on H.R. Res. 430*, 82d Cong., 2d Sess., 6 (1952). The Committee recommended approval in a report which again repeated that there was no change contemplated in the political, social and economic relationship between Puerto Rico and the United States. *House Report No. 1832*, 82d Cong., 2d Sess., 3 (1952). The record of the Senate hearings also clearly shows that it was well understood that the new Puerto Rico Constitution would have no effect on Puerto Rico's territorial status.[10]

After several intervening debates and hearings, the constitution enacted by Puerto Rico was approved, *but only after it was amended by Congress*, by the elimination of Section 20 thereof. *Conference Report*, H.R.Rep. 2350, 82d Cong., 2d Sess., 1–3 (1952). The amended constitution became Pub.L. 447, 66 Stat. 327 (1952), and thereafter was again adopted in Puerto Rico, as amended. 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, 2532–2534 (1961 ed.).

This process has led a noted constitutional scholar to state that:

"Though the formal title has been changed, in constitutional theory Puerto Rico remains a territory. This means that Congress continues to possess plenary but unexercised authority over Puerto Rico. Constitutionally, Congress may repeal Public Law 600, annul the Constitution of Puerto Rico and veto any insular legislation which it deems unwise or improper. From the perspective of constitutional law the compact between Puerto Rico and Congress may be unilaterally altered by the Congress. The compact is not a contract in a commercial sense. It expresses a method Congress chose to use in place of direct legislation ... Constitutionally, the most meaningful view of the Puerto Rican Constitution is that it is a statute of the Congress which involves a partial and non-permanent abdication of Congress' territorial power."

Helfeld, *Congressional Intent and Attitude Toward Public Law 600 and the Constitution of the Commonwealth of Puerto Rico*, 21 Rev.Jur.U.P.R. 255 (1952).

Several independent factors are available to indicate that federal power over Puerto Rico's internal affairs remained after 1952, although it was exercised to a much lesser degree than pre–1952. Even after 1952, this Court of Appeals continued to serve as Puerto Rico's court of last resort just as it had pre–1952. *See* 28 U.S.C. § 1293 (repealed 1961). That is, after 1952 appeals could still be taken as a matter of right from decisions of the Supreme Court of Puerto Rico in *all* cases, including those involving the *lexi fori* of Puerto Rico. This situation continued until 1961, when Congress *unilaterally* withdrew the right to appeal from the Supreme Court of Puerto Rico to this Court and put such decisions on an equal footing with the decisions of the highest courts of the states. *See* Pub.L. No. 87–189, § 3, 75 Stat. 417 (1961).[11]

Perhaps more significantly, however, several courts ruled that the legislative history of P.L. 600 showed no intent to make a change in Puerto Rico's territorial status. *Americana of Puerto Rico v. Kaplus*, 368 F.2d 431, 436 (3d Cir.1966) ("Puerto Rico is

---

**10.** During the Senate hearings, the Committee's legal counsel stated:

It is our hope and it is the hope of the Government, I think, not to interfere with the relationship but nevertheless the basic power inherent in the Congress of the United States, which no one can take away, is in Congress. *Hearings before the Senate Committee on Interior and Insular Affairs on S.J. Res. 151*, 82d Cong., 2d Sess., 40–47 (1952). Numerous statements appear on the record by members of Congress supporting this view and to the effect

that no change was envisioned in the constitutional status of Puerto Rico. *Id.* at 37 (Senator Guy Gordon); *id.* at 40–47 (Senator O'Mahoney); *id.* at 49 (Senator Long).

**11.** Puerto Rico also continued to be treated as a territory after 1952 under the provisions of the Federal Aviation Act of 1958, 49 U.S.C. §§ 1301 *et seq.*, pursuant to which this statute was made applicable to *intra* Puerto Rico air travel. 49 U.S.C. § 1301, ¶¶ 20(a), 21(a), and (31).

a 'territory' within the purview of Article IV, Section 3 [of the Constitution]"); *Detres v. Lions Bldg. Corp.*, 234 F.2d 596, 600 (7th Cir.1956) ("Puerto Rico both before and after the adoption and approval of its constitution was a territory of the United States"); *Lummus Company v. Commonwealth Oil Refining Co.*, 195 F.Supp. 47, 50 (S.D.N.Y.1961) ("absolutely clear terms"); *Nestlé Products, Inc. v. United States*, 310 F.Supp. 792, 796 (Customs Court, 1970) (P.L. 600 "did not change Puerto Rico's fundamental political relationship to the United States").

If *Mora v. Mejías, supra,* and other cases from this circuit [12] cast some doubt regarding Puerto Rico's post–1952 constitutional status and Congress' continuing plenary power over Puerto Rico, this doubt should have been dissipated by the Supreme Court's rulings in *Califano v. Torres*, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1977) and *Harris v. Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980). In those cases, in the course of sustaining the validity of Congressional legislation which discriminated against Puerto Rico and its residents, the Court affirmed the continuing validity of *Downes v. Bidwell* and *People v. Balzac,* [13] and reaffirmed the existence of Congress' post–1952 plenary power over Puerto Rico pursuant to the Territory Clause of the Constitution. *Califano*, 435 U.S. at 3 n. 4, 98 S.Ct. at 907 n. 4; *Harris*, 446 U.S. at 651–52, 653–56, 100 S.Ct. at 1929–30, 1930–32 (Marshall, J., dissenting). *See also Puerto Rico v. Branstad,* — U.S. —, 107 S.Ct. 2802, 97 L.Ed.2d 187 (Scalia, J., concurring).

Because Puerto Rico, notwithstanding P.L. 600, is still *constitutionally* a territory, *Puerto Rico v. Shell Co.* prevents the application of the "dual sovereignty" doctrine. That principle is applicable only where separate political entities *which derive their power from different sources* are involved. *Shell Co., supra; Health v. Alabama*, 474 U.S. 82, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985); *United States v. Wheeler*, 435 U.S. 313, 319–22, 98 S.Ct. 1079, 1083–85, 55 L.Ed.2d 303 (1978); *United States v. Lanza*, 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922). In *Shell Co.* the Court held that a territory derived its authority from Congress and therefore was not a sovereign for double jeopardy purposes.

Although, as the majority points out, there is no question but that in enacting P.L. 600 Congress intended to grant Puerto Rico autonomy over local matters, *Examining Board v. Flores de Otero*, 426 U.S. 572, 594, 96 S.Ct. 2264, 2277, 49 L.Ed.2d 65 (1976) ("[a] degree of autonomy and independence normally associated with States of the Union"), and "sovereignty over matters not ruled by the Constitution"; *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 8, 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982), it is significant that the Supreme Court has never joined these two catch phrases to say that Puerto Rico has a degree of *sovereignty* similar to that of the States.

Furthermore, I do not believe that quoting these catch phrases, which if carefully analyzed in context appear to be mere *dicta,* is substantively helpful. The Court had utilized such characterizations of Puerto Rico's local autonomy long before P.L. 600 was enacted and the succeeding events took place. In fact in the *Shell* case, the Court stated that the Foraker Act of 1900, 31 Stat. 77 (1900), Puerto Rico's original Organic Act, was essentially the same as

---

**12.** *Compare United States v. Valentine,* 288 F.Supp. 957 (D.C.P.R.1968) and *First Federal S. & L. v. Ruiz de Jesús,* 644 F.2d 910 (1st Cir.1981) with *Sea-Land Services, Inc. v. Municipality of San Juan,* 505 F.Supp. 533 (D.C.P.R.1980) and *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1981). *See also* the *dicta* in *United States v. Quiñones,* 758 F.2d 40, 42 (1st Cir.1985) (Puerto Rico ceased being a territory in 1952 and the authority of Congress over Puerto Rico emanates thereafter from the "compact" between United States and Puerto Rico, which Congress cannot unilaterally amend).

**13.** *Balzac* was cited as valid authority by the Supreme Court as recently as last year in *Posadas de Puerto Rico Assoc. v. Tourism Co.,* — U.S. — n. 1, 106 S.Ct. 2968, 2971 n. 1, 92 L.Ed.2d 266 (1986). *See also Torres v. Puerto Rico,* 442 U.S. 465, 468–471, 99 S.Ct. 2425, 2428–29, 61 L.Ed.2d 1 (1978).

other territorial legislation whereby "the power of the Territorial legislature was apparently as plenary as that of the legislature of a State," and quoted an earlier case which stated that "[t]he powers thus exercised by the Territorial legislatures are nearly as extensive as those exercised by any State legislature." *Shell*, 302 U.S. at 260, 58 S.Ct. at 171. With each new organic act, first the Foraker Act in 1900, then the Jones Act in 1917, 39 Stat. 951 (1917), and then the Puerto Rican Federal Relations Act in 1950 and later amendments, Congress has simply delegated more authority to Puerto Rico over local matters. But this has not changed in any way Puerto Rico's *constitutional* status as a territory, or the source of power over Puerto Rico. Congress continues to be the *ultimate source of power* pursuant to the Territory Clause of the Constitution. More recent cases further illustrate the flaw in the majority's reasoning.

In a unanimous opinion written by Chief Justice Burger in *Waller v. Florida*, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970), the Court ruled that the double jeopardy clause, as applied through the Fourteenth Amendment, bars successive prosecutions by a state and municipality for the same alleged crime. The Court stated:

> ... [T]he apt analogy to the relationship between municipal and state governments is to be found in the relationship between the government of a Territory and the Government of the United States. The legal consequence of that relationship was settled in *Grafton v. United States*, 206 U.S. 333, 27 S.Ct. 749, 51 L.Ed. 1084 (1907), where this Court held that a prosecution in a court of the United States is a bar to a subsequent prosecution in a territorial court, since both are arms of the same sovereign. [citing also *Puerto Rico v. Shell, supra*].

*Id.* at 393, 90 S.Ct. at 1188. The Court concluded that "[i]n this context a 'dual sovereignty' theory is an anachronism." *Id.* at 395, 90 S.Ct. at 1189.

In *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), also a unanimous opinion, the Court recognized as separate sovereigns for double jeopardy purposes, Indian tribes, because the tribes originally were separate sovereignties as nations, the vestiges of which sovereignty they still retained. *Id.* at 328, 98 S.Ct. at 1089. The Court differentiated the federal/tribal situation from the state/municipal and federal/territorial scenarios. Although it specifically recognized that Congress had given Puerto Rico "an autonomy similar to that of the states ...," *id.* at 319–20 n. 13, 98 S.Ct. at 1084 n. 13, it "reiterated that successive prosecutions by federal and territorial courts are impermissible because such courts are 'creations emanating from the same sovereignty'." *Id.* at 318, 98 S.Ct. at 1083. The Court similarly noted its holding in *Waller* prohibiting successive state municipal prosecutions "despite the fact that state law treated the two as separate sovereigns." *Id.* at 318–19, 98 S.Ct. at 1083.

The important point in all this, one which I believe is overlooked by the majority, is that it makes no difference how the legislature, whether state or federal, has treated the political subdivision; rather *it is the source from which the political entity derives its authority that determines who is sovereign.* What differentiates *Grafton*, *Shell* and *Waller* from the cases establishing the "dual sovereignty" exception to the double jeopardy clause is "not the extent of control exercised by one prosecuting authority over the other but rather the *ultimate source of the power* under which the respective prosecutions were undertaken." *Id.* at 320, 98 S.Ct. at 1084 (emphasis supplied). "City and State, or Territory and Nation, are not two separate sovereigns to whom the citizen owes separate allegiance in any meaningful sense, but one alone." *Id.* at 322, 98 S.Ct. at 1085. They thus are not separate sovereigns for double jeopardy purposes.[14]

---

14. Reliance by the majority on the authority of *United States v. Benmuhar*, 658 F.2d 14 (1st Cir.1981), is inappropriate because that case, as the present one, also involved different crimes in the Puerto Rico/federal jurisdictions, *i.e.,* arson and destruction of property (Puerto Rico) versus conspiracy (federal). Thus *Blockburger* was applicable, not the "dual sovereignty" theory.

Because I believe that Puerto Rico *constitutionally* remains a territory, I am unable to agree with the majority's conclusion regarding "dual sovereignty."

As previously indicated, I would have avoided reaching these constitutional issues by ruling pursuant to *Blockburger* that separate Puerto Rico/federal crimes are involved in the present cases. Since such a result allows me to agree with the outcome reached by the majority, however, I concur with the affirmance of the conviction.