TORRUELLA, Circuit Judge
(Dissenting).
I respectfully express my profound dismay with what I consider to be the majority’s 180-degree change of direction from, and disavowal of, the unanimous October 11, 2012 order to the district court. Nevertheless, I see little to be gained from engaging in ex post facto arguments regarding its content. It is what it is, and no amount of parole discussion will alter its text. The best evidence of what the panel actually agreed to is the order itself:
Having heard argument and carefully reviewed the record and the parties’ filings, we are of the view that plaintiff-appellant has demonstrated a likelihood of success on the merits of her challenge to Art. 6.012 ... We also conclude that plaintiff-appellant has made the requisite showing of the potential for irreparable harm, her inability to vote in the upcoming Puerto Rico general election, if the preliminary relief requested is denied. With respect to the third and fourth factors to be weighed in considering a motion for preliminary injunction, the balance of harms and the effect of the decision on the public interest, we find that the record is insufficiently developed on the factual issues. On appeal, the parties have made widely differing claims with respect to the feas-ability of granting the request for preliminary relief, specifically of permitting the voters who have been inactivated for failure to vote in the 2008 elections to vote in the general election on November 6, 2012. As an appellate court, and in the absence of an evidentiary hearing in the district court, we have no basis for assessing the validity of the parties’ factual claims.
Colón-Marrero v. Conty-Pérez, No. 12-2145 (1st Cir. Oct. 11, 2012) (order remanding case to the district court for an evidentiary hearing)(emphasis supplied). The underlined text indicates that the panel carefully considered the record and what the parties were claiming, that it deemed Plaintiff-Appellant’s claim to relate to her inability to vote at the general election, a term used twice in the order, and that the case was being remanded to the district court for the purpose of receiving evidence on the factual claims relating to the third and fourth factors of the preliminary injunction criteria: the balance of harms and the effect of the decision on the public interest. The order unambiguously states that the panel deemed the first two factors, likelihood of success on the merits and irreparable harm, both of which are legal determinations, to have already been established.
It is within those parameters that we ordered the fact finding hearing to be held before the district court, and further, it is to develop the record as to those two factors that the district court produced its findings of fact. These findings, based on the evidence adduced at the hearing, re- *141 suited in a certification that it was feasible to allow the voters stricken from the lists to vote in the forthcoming general elections, if certain attainable processes were immediately put into effect. See Findings Certified to the Court of Appeals, Colón-Marrero v. Conty-Pérez, No. 12-cv-1749, 2012 WL 5185997 (D.P.R. Oct. 17, 2012) (“In sum, the Acevedo proposal meets all feasibility requirements.”).
Notwithstanding these factual findings, and the legal conclusions contained in our order of October 11, 2012, upon return of the matter to this Court, a majority of the original panel, without giving any explanation whatsoever as to its change of course, “concluded that serious feasibility issues preclude[d] the entry of the relief sought by plaintiff-appellant.” Colón-Marrero v. Conty-Pérez, No. 12-2145 (1st Cir. Oct. 18, 2012) (order denying preliminary injunction). This action was taken without any reference to the requirements of Fed. R.Civ.P. 52(a)(2), and in clear violation of its mandate. See id. (“Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court’s opportunity to judge the witnesses.”). See also Con-structora Maza v. Banco de Ponce, 616 F.2d 573, 576 (1st Cir.1980) (the clearly erroneous rule applies in all nonjury cases “not only when the district court’s findings are based upon its assessment of conflicting testimony, but also when as here, much of the evidence is documentary and the challenged findings are factual inferences drawn from undisputed facts”).
Our October 11 order is the law of this case, and should have been set aside only if the panel majority found it to be “clearly erroneous” and to have resulted in “a manifest injustice.” Pepper v. United States, - U.S. -, 131 S.Ct. 1229, 1250-51, 179 L.Ed.2d 196 (2011)(internal citations omitted). Of course, no such finding was made because the record would not credibly support it.
The importance of the findings of fact by the trial court in this case, and the innate wisdom of Fed.R.Civ.P. 52(a)(2) in a situation such as was presented to us, are of particular relevance because the nuances that are evident to an experienced magistrate "with local knowledge, such as Judge Cerezo, are not apparent, and are most likely lost, to an appellate court relying solely on a cold record, sitting thousands of miles away from the scene of a developing scenario. Thus, the findings of the trial court in the present case should have been given particular deference, even more so by the standard of Fed.R.Civ.P. 52.
I shall not further dwell on this point, but choose to go to the merits of this controversy, which I believe should have strongly favored Plaintiff-Appellant had justice prevailed in this case.
In my opinion, after the district court’s findings were extant, the requirements of Planned Parenthood League v. Bellotti, 641 F.2d 1006, 1009 (1st Cir.1981), were met and a preliminary injunction should have been issued. See id. (setting forth the standards for the issuance of a preliminary injunction). I shall briefly explore seriatim each of the four factors established in Planned Parenthood:
(1) The likelihood of success on the merits
As was recently stated by the same panel that is now ruling on the present case, “[i]n the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis.” Sindicato Puertorriqueño de Trabajadores v. Fortuno, 699 F.3d 1, 10 (1st Cir.2012)(citing Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)).
*142 In this appeal, the central issue relating to this requirement is a determination of the applicability of two federal statutes to the Puerto Rican electoral processes, namely, the National Voter’s Registration Act of 1993 (“NVRA”), 42 U.S.C. §§ 1973gg-1973gg-10, and the Help America Vote Act of 2002 (“HAVA”), 42 U.S.C. §§ 15301-15545. Both of these statutes require, among other things, that state and local governments not remove voters from active voter lists until after they decline to vote in at least two consecutive elections for Federal office. See 42 U.S.C. § 1973gg-6(b) & § 15483(a)(4).
These statutes apply to Puerto Rico. By virtue of section 3(2) of the NVRA, 42 U.S.C. § 1973gg-l(2), the term “Federal office” shall have the same meaning it has in section 301(3) of the Federal Election Campaign Act of 1971 (“FECA”), 2 U.S.C. § 431(3). Pursuant to section 301(3) of FECA the term “Federal office” includes, “the office of ... Resident Commissioner to, the Congress.” Id. The only jurisdiction of the United States in which this office exists is in the Commonwealth of Puerto Rico. See 48 U.S.C. § 891.
The NVRA, however, does not expressly mention Puerto Rico within its definition of “State.” See id. § 1973gg-l(4).[10] As will be further explained infra, that does not have the effect of making the statute inapplicable to Puerto Rico. Most importantly, neither does it nullify the express inclusion within its scope of elections for the office of Resident Commissioner made by virtue of its clear reference to section 301(3) of FECA.
Conversely, HAVA, which was enacted almost ten years after the NVRA, expressly includes Puerto Rico in its definition of “State.” See id. § 15541. Section 303 of HAVA prescribes the requirements that must be met by the voter registration systems used by the states in elections where a Federal office is at stake. Among said prescriptions is the prohibition of removal from voter registration lists until after the voter declines to vote in two consecutive elections for Federal office. Plaintiff-Appellant seeks to enforce this proscription against the Commonwealth’s conflicting disenfranchisement provision. See id. § 15483(a)(4). Section 303 of HAVA also incorporates the NVRA’s provision regarding elimination of voters from voter registration lists for not voting. See 42 § 15483(a)(2)(A)(i). Given that these provisions prescribe the way Puerto Rico must keep its voter registration rolls for elections for Federal office, and that Puer-to Rico, like many states, has a single voter registration system — not two — these provisions necessarily regulate the registration lists for the general elections in Puerto Rico, which always include the election for the Resident Commissioner as an integral part of the general election process. See American Civil Liberties Union v. Santillanes, 546 F.3d 1313, 1325 (10th Cir.2008)(“HAVA applies to all elections that include election to federal offices.”)(emphasis supplied); Crowley v. Nevada ex rel. Nevada Secretary of State, 678 F.3d 730, 735 (9th Cir.2012)(same).
Furthermore, HAVA also provides that, as a condition to receiving Federal funding pursuant to its provisions, states must draft and submit “State plans” and detail how they meet the requirements of sub-chapter III of HAVA, which includes the prohibition at issue here. See id. §§ 15401(b), 15483(a)(2)(A)® & (a)(4)(A). The record reflects that the Commonwealth has been the recipient of these funds and that it has used them to comply with some provisions of subchapter III of HAVA, but has chosen to opt out of other *143 provisions of the same subchapter, such as the prohibition involved in this case. See Puerto Rico’s Plan for Implementation, Plaintiff-Appellant’s Br., Add. A, at 46-50.
As stated above, the NVRA expressly includes in its definition of Federal office the office of “Resident Commissioner,” but fails to specifically mention Puerto Rico in its definition of “State.” I believe this omission does not nullify the express intent of Congress to include within the scope of the NVRA the office of Resident Commissioner, an office for which elections are only held in Puerto Rico.
Even if we were to attribute significance to the omission in question, the special interpretive default rule that has evolved over time in the First Circuit pursuant to Section 9 of the Puerto Rican Federal Relations Act, 48 U.S.C. § 734 (“[t]he statutory laws of the United States not locally inapplicable ... shall have the same force and effect in Puerto Rico as in the United States”), 'unequivocally mandates the application of the NVRA and HAVA to the present controversy. According to said rule “as a general matter, a federal statute does apply to Puerto Rico under [48 U.S.C.] § 734.” United States v. Acosta-Martinez, 252 F.3d 13, 18 (1st Cir.2001) (finding that the Federal death penalty applies to Federal crimes committed in Puerto Rico notwithstanding a provision in the Commonwealth’s constitution that prohibits its imposition).
There is abundant jurisprudence in which statutes that fail to specifically include Puerto Rico within the definition of “State,” have nevertheless been interpreted to include Puerto Rico within the coverage of the legislation in question. See, e.g., Acosta-Martinez, 252 F.3d at 20 n. 6 (citing Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 590, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); TAG/ICIB Servs., Inc. v. Pan Am. Grain Co., 215 F.3d 172, 178 (1st Cir.2000) (Interstate Commerce Commission Termination Act applies to Puerto Rico); United States v. Lopez Andino, 831 F.2d 1164, 1167 (1st Cir.1987) (statutory prohibition on conspiracies to deprive citizens of civil rights applies to Puerto Rico); United States v. Tursi, 655 F.2d 26, 27 (1st Cir.1981) (assuming that Youth Corrections Act applies to Puerto Rico); NLRB v. Sec. Nat’l Life Ins. Co., 494 F.2d 336, 337-38 (1st Cir.1974) (National Labor Relations Act applies to Puerto Rico)). See also Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 672, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (“Puerto Rico has thus not become a State in the federal Union like the 48 States, but it would seem to have become a State within a common and accepted meaning of the word.”); United States v. Laboy-Torres, 553 F.3d 715, 721-22 (3d Cir.2009) (O’Connor, Associate Justice, Retired)(same).
In fact, “[t]his [C]ourt has consistently applied statutes advancing federal interests to Puerto Rico even when Congress has been silent on the matter.” Acosta-Martinez, 252 F.3d at 20 n. 6. When seen in the context of the First Amendment rights in question and the paramount federal interests embodied in the provisions of the NVRA and HAVA, the present case should not be an exception to the application of the default rule as nothing in their content makes the provision in question “locally inapplicable,” except, perhaps, the existence of the contravening Puerto Rico legislation in question as was the case in Acosta-Martinez. Federal elections statutes in general, as seen in NVRA’s reference to FECA and HAVA’s reference to the NVRA, are interwoven, and the advancement of their interests (i.e. the advancement of First Amendment protections) constitute a paramount and superceding national interest under the *144 Supremacy Clause of the Constitution, which calls for the application of the default rule in this case.
In Acosta-Martinez this Court confidently stated that, even if Congress’ intent to apply the death penalty to Puerto Rico were not as clear as it found it to be, “the outcome would be the same, since the default rule presumes the applicability of federal laws to Puerto Rico. There is little reason to think that the federal interests in defining the punishment for federal crimes would have been considered by Congress to be a matter for local veto power.” Acosta-Martinez, 252 F.3d at 20. I am disillusioned by an outcome by which this Court applies the default rule to allow the imposition of the death penalty to Federal crimes committed in Puerto Rico, but fails to apply the same standard to promoting democratic rights through the First Amendment.
Paraphrasing what was stated by this Court in Acosta-Martinez in finding that it was Congress’ intent to apply the federal death penalty to crimes committed in Puerto Rico, “[i]ndeed, it would be anomalous for Congress to grant the people of Puerto Rico American citizenship and then not afford them the protection of the federal [voting] laws.” Acosta-Martinez, 252 F.3d at 20-21.
The majority has attempted to establish that there are “enough signals” in the NVRA’s legislative history to demonstrate that Congress intended to make this statute inapplicable to Puerto Rico. They attempt to bolster the importance of these signals by relegating the most significant statutory provision for our purposes — the provision which expressly mentions the office of Resident Commissioner — to a footnote. The majority then characterizes this provision as “one contrary signal in an otherwise consistent set of factors.” Maj. Op. at 137 n. 6. I find this assertion to be beyond the pale. Struthiously ignoring a specific provision of a Congressional statute, while relying on the self-serving ruminations of individual Congressmen on the floor is a specially egregious means of defeating the exercise of the right to vote.[11] In this respect, Justice Scalia’s *145 comments in Conroy v. Aniskoff regarding legislative history are particularly relevant: “the use of legislative history [is] the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one’s friends.” 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (paraphrasing Judge Harold Leventhal). Using scant and irrelevant legislative history to exclude the election for the office of Resident Commissioner under the NVRA is thus disingenuous.
The majority also points to an earlier version of the statute to support its position. However, just last year, the Supreme Court stated that, to explain the unexplained disappearance of language from a bill the Court will not rely on “mute intermediate legislative maneuvers.” Mil-ner v. Dep’t of the Navy, — U.S. -, 131 S.Ct. 1259, 1266, 179 L.Ed.2d 268 (2011) (citing Mead Corp. v. Tilley, 490 U.S. 714, 723, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989)).
(2) Irreparable harm
The right to vote is without question a fundamental constitutional right guaranteed by the First Amendment of the Constitution. Conversely, but equally important, the right to abstain from voting also constitutes political speech, and as such, is entitled to the highest of protections under the provisions of the First Amendment. Infringement of either of these two modalities of the exercise of First Amendment rights by a State constitutes irreparable harm per se. Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); Romero Feliciano v. Torres Gaztambide, 836 F.2d 1, 4 (1st Cir.1987). In fact, this same panel has also recently stated that “[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.” Sindicato Puertorriqueño de Trabajadores, 699 F.3d at 11 (quoting El-rod, 427 U.S. at 373, 96 S.Ct. 2673).
(3) and (4) Balance of the equities and harm to the public interest
Having the benefit of the findings of the district court, which are fully supported by the record of the proceedings before said forum, it must forcefully be concluded that this court is required to find that the balance of the equities that may result from the issuance of a preliminary injunction ordering that Plaintiff-Appellant, and other voters stricken from the voter registration lists by reason of their abstention from voting in the 2008 election, clearly favors their reinstatement as voters eligible to vote on November 6, 2012. Depriving a citizen of this most fundamental right cannot begin to be equated to the administrative inconveniences that are claimed by Defendants-Appellees.
Closely related to this issue is the alleged harm to the public interest, an issue which can be mitigated in large part by the remedy that should have been put in place had the findings of the district court not been cast aside without explanation by this court. It is beyond ken that the public is benefitted, not harmed, by having the largest number of its citizens express themselves democratically in a properly conducted election.

*146
Conclusion

I am sorry to say that once again this Court’s reluctance to recognize gross violations of fundamental rights results in the enlargement of the democratic deficit that already assails the United States citizens of Puerto Rico. Igartúa v. United States, 626 F.3d 592, 638-39 (1st Cir.2010)(Torru-ella, J., dissenting).
I respectfully dissent.

. Neither does it expressly exclude it.

. It is unfortunate that the majority cites to Representative Solomon and Senator Helms' respective expressions as if they were somehow valuable signals of Congressional intent not to apply the NVRA to Puerto Rico, when in fact they were not made in the context of a discussion regarding the territorial application of the statute. During the intervention cited to by the majority, Sen. Helms explained:
Mr. President, this conference report will cost the States, all 50 of them, and their respective taxpayers, millions of dollars while making it even easier for illegal aliens to register to vote and obtain welfare benefits.
This is an outrageous set of circumstances, and I am especially disappointed that the conference committee stripped out the Simpson-Helms amendment that would have prevented illegal aliens and nonciti-zens from voting. This amendment, approved by the Senate, was simple and straightforward: it allowed States to require proof of citizenship of any individual desiring to register to vote. Why did the political types in this country decide this was too much to ask?
Mr. President, without this amendment, illegal aliens such as Zoe Baird’s chauffeur could end up voting in our elections. This bill should be called the Illegal Aliens' Voter Registration Act.
139 Cong. Rec. S5739 (1993).
Representative Solomon’s expressions, which the majority also cites to, were made in the context of denouncing that the representatives of the territories were allowed to vote when, in his view, the statute did not apply to them. He stated:
Mr. Speaker in a few minutes four Delegates are going to come over here when we resolve ourselves into the Committee of the Whole and they are going to cast votes for this piece of legislation which mandates a cost on all 50 states, but not on the territories they represent, because the territories are not included.
*145 This is typical of what is going to happens [sic] time after time, after time. That is why it is a shame that my colleagues have let this kind of rule to take place, I say to my colleagues, come over here and defeat the previous questions, and I’ll have an opportunity to offer an amendment which would include the territories along with us other 50 poor states.
How about that?
Id. at H504.