# Gulf War Veterans Health Statutes

Section 1604 of the Persian Gulf War Veterans Act of 1998 is constitutionally invalid insofar as it purports to nullify prospectively certain described legislation that might be enacted in the future.

Overlapping provisions of the Veterans Programs Enhancement Act of 1998 and the Persian Gulf War Veterans Act of 1998, although redundant and burdensome in some respects if both statutes are given effect, are not inherently conflicting or mutually exclusive and therefore both provisions must be treated as valid and given effect.

March 12, 1999

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF VETERANS AFFAIRS

This responds to your letter of December 8, 1998, requesting our legal opinion on questions raised by two conflicting or overlapping statutes, passed by Congress on the same day, responding to the health risks associated with military service in the Persian Gulf War ("Gulf War").[1] The statutes in question are the Veterans Programs Enhancement Act of 1998, Pub. L. No. 105–368, 112 Stat. 3315 ("VPEA"), and the Persian Gulf War Veterans Act of 1998, passed as Title XVI of Division C of the Act Making Omnibus Consolidated and Emergency Supplemental Appropriations for Fiscal Year 1999, Pub. L. No. 105–277, 112 Stat. 2681–742 ("GWVA"). We conclude that: (1) section 1604 of the GWVA is constitutionally invalid and ineffective insofar as it purports to nullify certain described legislation (including section 101 of the VPEA) that might be enacted in the future; (2) under governing principles of statutory interpretation, every effort must be made to reconcile the provisions of two statutes enacted under the circumstances presented here before resorting to rules of construction giving one primacy over the other; and (3) the respective provisions of the two laws that you have asked us to analyze, although redundant and burdensome in some respects if both laws are given effect, are not inherently conflicting or mutually exclusive, and therefore the provisions of both laws must be treated as valid and effective.

## I.

The statutes in question here were both introduced in response to the October 1997 recommendation of the Presidential Advisory Committee on Persian Gulf War Illnesses that Congress enact a permanent statutory program for providing

---

[1] Letter for Randolph Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Leigh A Bradley, General Counsel, Department of Veterans Affairs (Dec 8, 1998) ("VA Letter") In considering this matter, we also received and considered the views of the General Counsel of the Office of Management and Budget. *See* Letter for Randolph Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Robert G Damus, General Counsel, Office of Management and Budget (Jan. 25, 1999)

compensation and benefits to veterans suffering illnesses as a result of their Gulf War service. The VPEA was originally introduced as H.R. 4110 in the 105th Congress. H.R. 4110 was unanimously passed by the House of Representatives on October 10, 1998. It was subsequently passed by the Senate on October 21, 1998 — several hours after final congressional passage of the GWVA as part of the Omnibus Appropriations Act. It was signed into law by the President on November 11, 1998.

The provisions enacted as the GWVA were largely drawn from S. 2358, a bill originally introduced in the 105th Congress by Senators Byrd, Rockefeller, and Specter. *See* 144 Cong. Rec. S12,832 (daily ed. Oct. 21, 1998) (statement of Sen. Byrd). S. 2358 was passed by the Senate on October 8, 1998, but was never taken up as such by the House. The key provisions of S. 2358 were then attached in the form of the GWVA as an amendment to the Omnibus Appropriations Act, at the behest of Senator Byrd, and passed by both the House and Senate on October 21, 1998 — several hours before final congressional passage of the VPEA. The Omnibus Appropriations Act was also signed by the President on October 21, 1998.

In summary, although final congressional passage of both laws occurred on the same day, the VPEA was both passed by the Congress and signed into law by the President after the GWVA. Thus, the VPEA constitutes the later enacted of the two statutes.

Both laws require the Secretary of Veterans Affairs ("Secretary") to seek to enter into an agreement with the National Academy of Sciences ("NAS") to study and report upon the relationship between service in the Gulf War, certain factors and conditions (such as use of particular vaccines and exposure to specified substances) associated with such service, and illnesses experienced by Gulf War veterans. Although the respective NAS studies required by the two statutes overlap in substantial respects, there are a number of differences between them. The study required under the VPEA, for example, requires an assessment of latency periods that is not required under the GWVA. The GWVA, on the other hand, contains a requirement to include Uranium among the synthetic chemical compounds to be considered as a potential source of illness, whereas the VPEA omits that particular requirement. Additionally, the statutory deadlines for completion of the respective NAS studies are different, in that the GWVA provisions establish a considerably shorter timetable. The study authorized by the GWVA must be completed no later than 18 months after that bill's date of enactment (i.e., October 21, 1998), whereas the study authorized by the VPEA is not due until two years after the date the Department of Veterans Affairs ("VA") enters into a contract with the NAS. The most significant variation between the two bills is that the GWVA requires the VA Secretary to make an administrative determination whether the covered illnesses warrant a presumption of service connection, which would substantially enhance the ability of Gulf War veterans to establish claims

for disability entitlements under 38 U.S.C. § 1110 (1994), whereas the VPEA merely requires the Secretary to submit to designated congressional committees a report with non-binding recommendations as to whether there is sufficient evidence to warrant a presumption of service connection for the occurrence of the specified illnesses and conditions found in Gulf War veterans.

In light of the differing provisions and requirements of the two statutes, you have requested our legal opinion on a number of questions. Initially, you seek our opinion whether section 1604 of the GWVA, which purports to nullify prospectively later enacted legislation (and section 101 of the VPEA in particular) respecting authorization of a Gulf War study and related issues, is constitutional and effective. In the event we conclude section 1604 does not effectively nullify the provisions of the VPEA, you seek our guidance as to whether the various provisions of the respective bills may be reconciled and, insofar as they cannot be reconciled, which of the two statutes is to be given controlling effect.

## II.

### A.

The first issue that must be resolved in determining the relationship between these two statutes is whether section 1604 of the GWVA effectively nullifies the Gulf War health study provisions contained in section 101 of the VPEA. Section 1604 provides:

> In the event of enactment, before, on, or after the date of the enactment of this Act, of section 101 of the Veterans Programs Enhancement Act of 1998, or any similar provision of law enacted during the second session of the 105th Congress requiring an agreement with the National Academy of Sciences regarding an evaluation of health consequences of service in Southwest Asia during the Persian Gulf War, such section 101 (or other provision of law) shall be treated as if never enacted, and shall have no force or effect.

As relevant here, section 1604 would prospectively nullify the ability of Congress and the President to enact effective legislation on a designated subject during the remainder of the 105th Congress. Such a measure is incompatible with the provisions for the enactment of laws set forth in Article I, section 7 of the Constitution because it purports to invalidate by statute subsequent legislation duly enacted through valid constitutional processes. *See Manigault v. Springs*, 199 U.S. 473, 487 (1905) ("a general law . . . may be repealed, amended or disregarded by the legislature which enacted it," and "is not binding upon any subsequent

legislature''); *United States v. Lopez Andino*, 831 F.2d 1164, 1172 (1st Cir. 1987) (Torruella, J., concurring) ("under well-established constitutional precedent, as an act of Congress it does not bind future Congresses"), *cert. denied*, 486 U.S. 1034 (1988); *Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1113 (D.C. Cir. 1978) ("To be sure, Congress is generally free to change its mind; in amending legislation Congress is not bound by the intent of an earlier body.").[2] Accordingly, we conclude that section 1604 does not nullify or abrogate the later-enacted provisions of section 101 of the VPEA.

## B.

Although section 1604 of the GWVA cannot constitutionally nullify the subsequent enactment of section 101 of the VPEA, it remains to be considered what effect, if any, should be given to section 1604 as evidence of congressional intent in construing the effect and relationship of the two statutes. Specifically, does the enactment of section 1604 establish that Congress intended the provisions of the GWVA to be controlling to the extent that they would conflict with the later-enacted provisions of section 101 of the VPEA? In this regard, it is to be noted that section 1604 directly confronts the possibility of conflict between the two provisions, whereas the VPEA does not address that subject at all. It might be argued, therefore, that section 1604 is to that extent a more specific provision that should control over the provisions of the VPEA insofar as there is irreconcilable conflict. *See, e.g., Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 240 (6th Cir. 1990) (where two statutes conflict, regardless of priority of enactment, the more specific statute ordinarily controls the more general).

We conclude that section 1604 does not establish the primacy of the provisions of the GWVA in relation to those of the VPEA insofar as the two provisions conflict. The Gulf War study provisions of the GWVA are not more specific than those of section 101 of the VPEA in the sense in which the specific/general dichotomy is used in this context; rather, the two provisions are at the same order of specificity. The mere fact that section 1604 of the GWVA ineffectually purports to nullify the later-enacted provisions of section 101 of the VPEA, moreover, does not render the former statute more specific than the latter in the sense intended by the rule of construction. Further, section 1604 does not actually address the issue of *reconciling* the two provisions; its sole stated objective is to *nullify com-*

---

[2] In holding that an act of Congress cannot bind "future Congresses," *Lopez Andino* and other cases using such phrasing do not implicitly suggest that an act of Congress *can* bind the *same* Congress when that Congress subsequently undertakes to enact legislation contrary to the earlier enactment. In either circumstance, the controlling general principle is that an act of Congress (as distinguished, for example, from an amendment to the Constitution) cannot prohibit the enactment of subsequent contrary legislation through valid constitutional processes This is not to say that earlier adopted legislation, such as the Dictionary Act, *see* 1 U.S.C. § 1 (Supp. III 1997), cannot influence the interpretation or meaning of later adopted legislation. Such earlier legislation may influence the meaning of terms in a subsequent enactment, to the extent consistent with that enactment. But Congress always retains the authority, subject to constitutional limitations such as due process, to override the earlier enactment through duly enacted subsequent legislation

*pletely* any enactment of the provisions of section 101, which is not constitutionally permissible.

Notwithstanding the prior passage of section 1604 as part of the Omnibus Appropriations Act, the Senate proceeded to pass the VPEA hours later — including without alteration, let alone any indication of repeal, the targeted provisions of section 101. Such action is difficult to reconcile with a genuine congressional intent to nullify section 101. The Senate debate on final passage of the VPEA, moreover, does not support the odd view that the Senate intended that the very provisions of section 101 that it was enacting without amendment (let alone removal) would have no effect. In comments upon the VPEA — comments made *after* Congress had already passed section 1604 of the GWVA — Senator Rockefeller (ranking member of the Senate Committee on Veterans' Affairs and an original co-sponsor of S. 2358, the bill that was later essentially enacted as the GWVA) made the following observations touching on the relationship between the two bills:

> [T]his bill [the VPEA] directs the Secretary of Veterans Affairs to enter into agreements with the NAS to conduct studies and provide recommendations for research that may be needed to better understand the possible health effects of exposures to toxic agents or environmental or wartime hazards associated with Gulf War service. The NAS will also provide recommendations to VA on the development of continuing medical education programs on the treatment of war-related illnesses and the assessment of new treatments to alleviate the effects of these illnesses.

144 Cong. Rec. at S12,933 (daily ed. Oct. 21, 1998). Referring to what he perceived as shortcomings in the provisions of section 101 of the VPEA (i.e., H.R. 4110), Senator Rockefeller observed:

> However, I was disappointed that we were unable to move beyond the initial steps contained in H.R. 4110 in negotiations with the House and Senate Veterans' Affairs Committees. H.R. 4110 only provides for VA to contract with NAS to perform the scientific review to identify potential exposures and illnesses associated with those exposures, but excluded the critical directive and guidance to VA to make determinations about compensation and presumption of battlefield exposures. Nonetheless, I felt that it was important that we accomplish what we could in this Congress to begin the process, although I realized this would still leave more for us to accomplish in the 106th Congress.

We would have been left with *only this initial step* were it not for the senior Senator from West Virginia, Senator Byrd. Senator Byrd successfully negotiated the inclusion of the compensation and presumption provisions of S. 2358 in the Omnibus Appropriations bill.

*Id.* at S12,933 (emphasis added).

Senator Rockefeller's statement does not support the view that the VPEA was passed with a tacit understanding that it would be subordinate to, or nullified by, section 1604 of the GWVA. Especially in light of the fact that Senator Rockefeller was a proponent of the legislation that became the GWVA, his statement indicates instead that the two provisions were viewed as cumulative, rather than conflicting and mutually exclusive. Thus, Senator Rockefeller described section 101 of the VPEA as an "initial step," with the provisions of the GWVA addressing the perceived shortcomings of the former statute by *additionally* providing for compensation and presumption of service connection.

A conclusion that section 1604 of the GWVA wholly superseded the later-enacted provisions of the VPEA would require a presupposition that the Senate proceeded to enact the VPEA recognizing all the while that its extensive and detailed Gulf War study provisions were meaningless and inoperative. Apart from the text of section 1604 itself — which we have already concluded is ineffective insofar as pertinent here — we find no evidence of that understanding on the part of the Senate as it passed the VPEA, and substantial evidence to the contrary in the statement of Senator Rockefeller.

## C.

Having concluded that section 1604 of the GWVA does not effectively nullify the provisions of section 101 of the VPEA, we now consider how these two overlapping enactments should be interpreted and applied. An early opinion of the Attorney General sets forth the key legal principles that were employed to resolve a strikingly similar statutory dilemma:

> By old and well-established canons of construction it is settled that every effort should be made — in the absence of express words of repeal — to harmonize seemingly conflicting provisions in statutes in pari materia passed at the same time, or approximately the same time, even though one of the acts contains language which, in ordinary circumstances and except for the element of contemporaneity, would be deemed to displace the other. The presumption that in such cases the legislature did not intend any inconsistency, no doubt has special force in the case of statutes passed on the

same day, and it is entirely clear that such statutes ought, if possible, to be so construed as to allow both of them to stand, for, as was said by the Supreme Court of Maine in *Stuart v. Chapman*, 104 Me. 17, 23, in discussing a situation similar to the one here presented —

> "It avoids the absurdity of holding that the legislature, whose proceedings are presumed to be conducted with wisdom and deliberation, enacted and repealed a statute upon the same day; or that the house and senate gravely and solemnly passed through all their several stages two inconsistent acts, either one of which would repeal the other, and sent them at the same time to the governor, intending that, and that alone, should become a law of the land to which he happened last to affix his signature."

*War-Risk Insurance Act — Repeal of Gratuity Laws*, 31 Op. Att'y Gen. 205, 208 (1918) ("AG Opinion").

Here, too, we confront statutes in pari materia passed on the same day, but with one of the acts containing language — i.e., section 1604 of the GWVA — that could (setting aside the temporal sequence of enactment) be deemed to displace the other. Accordingly, we find that the Attorney General's above-quoted formulation provides the appropriate framework for interpreting the two provisions in question here — that is, every effort should be made to harmonize or reconcile their apparent conflicts, without distorting their plain meaning. *See also Morton v. Mancari*, 417 U.S. 535, 550 (1974) ("In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."); *United States v. Trident Seafoods Corp.*, 92 F.3d 855, 862 (9th Cir. 1996) ("to the extent that statutes can be harmonized, they should be, but in case of an irreconcilable inconsistency between them the later and more specific statute usually controls the earlier and more general one"), *cert. denied*, 519 U.S. 1109 (1997). Moreover, apart from the canon of statutory construction favoring harmonization, with respect to these two statutes there is relevant evidence from the legislative history weighing in favor of harmonization: Senator Rockefeller stated that the VPEA represented the "initial step" and that the GWVA moved beyond that step. *See* 144 Cong. Rec. at S12,933.[3] Given the canon of construction and this legislative history, the case for harmonization is compelling.

---

[3] Nothing in the debate or floor statements accompanying final passage of the VPEA indicates that it was considered irreconcilable with the provisions of the GWVA. However, Representative Stump (Chairman of the House Veterans' Affairs Committee), in connection with the insertion of the GWVA provisions into the Omnibus Appropriations Act, expressed the view that aspects of the GWVA were irreconcilable with those of the VPEA. *See* 144
Continued

## D.

We now consider whether the Gulf War health study provisions of the VPEA and the GWVA may both be given effect through reconciliation, or whether they are in such irreconcilable conflict that one provision must be given primacy under controlling principles of construction. In doing so, we apply the standard of irreconcilability employed by the Attorney General in his 1918 opinion: "To obey one provision is to ignore the other; to disobey one is to give effect to the other." AG Opinion at 209. We conclude that, for all material and significant purposes, the two statutes are not irreconcilable.[4] Although there is considerable overlap and some disparity between the two provisions — for example, they require the preparation of predominantly similar reports on Gulf War service-related illnesses by the NAS, but the reports differ in some notable respects and are subject to different submission deadlines — compliance with either of the statutes does not appear to render compliance with the other impossible or compel disobedience to it.

Probably the most significant difference between the two statutes is their respective approaches to a "presumption of service connection" for illnesses associated with Gulf War service. GWVA, 112 Stat. at 2681–743. Under section 1602 of the GWVA, which would enact a new 38 U.S.C. § 1118, the Secretary must *determine*, based on the NAS report, whether the covered illnesses warrant a presumption of service connection by reason of certain associations described in the GWVA. That determination would be formally promulgated in regulations and then come into play in the disposition of claims for compensation for service-connected disabilities under 38 U.S.C. § 1110. The VPEA, in contrast, does not direct or authorize the Secretary to make such a determination. Rather, section 101(i)(2) thereof merely requires the Secretary to submit to designated congressional committees a report with *recommendations* as to whether there is sufficient evidence to warrant a presumption of service connection for the occurrence of specified conditions in Gulf War veterans, based upon the NAS report and the comments of government agencies in response to that report.

We conclude that these two provisions are not mutually exclusive and that, accordingly, the VA must attempt to comply in good faith with both provisions.

---

Cong. Rec H11,656–57 (daily ed. Oct 20, 1998). Specifically, Representative Stump contended that the GWVA's provision for a binding Secretarial determination on the presumption of service connection left Congress with "no role in deciding the future compensation policy for veterans," whereas the VPEA provided for the VA Secretary to make non-binding recommendations to Congress with respect to that issue *Id.* at H11,657. While we agree that the two statutes take different approaches to this issue, those approaches do not appear to be mutually exclusive or irreconcilable, as we discuss in Section II.D *infra* As indicated in the text, moreover, it has long been established that roughly contemporaneous statutes should be harmonized where possible Nonetheless, Representative Stump's statement indicates that Senator Rockefeller's view was not universally shared

[4] Given the detailed and technical nature of the two statutes' specifications for the NAS studies and the Secretary's response thereto, our opinion does not purport to determine that there are no irreconcilable discrepancies whatsoever between *any* provisions of the two bills The VA would have superior expertise to identify any such irreconcilable discrepancies at a factual level, but it has not called to our attention, nor have we identified, any of that nature

Compliance with the GWVA's requirement for an administrative determination on the presumption of service connection does not require the Secretary to "ignore" or "disobey," *see* A.G. Opinion at 209, the VPEA's distinct requirement for submitting a recommendation respecting that same issue to the congressional committees. Although it may seem burdensome or redundant, we are unable to find a convincing reason why the Secretary cannot do both. The chief argument supporting the view that the two measures are mutually exclusive might rest on the premise that the later submission of a recommendation to the congressional committees pursuant to the VPEA would amount to a futile or ineffectual gesture inasmuch as the Secretary would already have made an effective administrative determination that the presumption of service connection is warranted or not warranted pursuant to the GWVA. Such a premise would not be valid, however, because the provision of the Secretary's recommendations to the congressional committees would still provide Congress with pertinent information enabling it to consider and possibly to enact legislation reflecting a distinct congressional resolution of the presumption-of-service-connection issue. Compliance with both of these provisions, moreover, would not appear to be inordinately burdensome, inasmuch as the assessment and analysis underlying both the VPEA recommendation and the GWVA determination would involve substantial overlap.

What we have said with respect to the differing provisions of the two statutes on resolving the presumption-of-service-connection issue applies as well to the other possible disparities identified in your submission to this Office.

One set of possible disparities that you have identified is that the two statutes have a number of differences in their provisions for the review of scientific evidence to be conducted by the NAS. *See* VA Letter at 4–6. Under section 101(c)(1)(B) of the VPEA, for example, the NAS would be required to identify illnesses "associated with the agents, hazards, or medicines or vaccines" described in that statute, whereas under the GWVA the requirement calls for the identification of the illnesses (including diagnosed and undiagnosed illnesses) that are "manifest" in Gulf War veterans. GWVA § 1603(c)(1)(B). While these requirements are not identical or co-extensive — there may, for example, be some illnesses "manifest" in Gulf War veterans that are not actually associated with the specific potential causes listed in the VPEA — they clearly entail substantial overlap.

Additionally, there are particular items required in the NAS study described in one of the statutes that are not required in the other. The VPEA, for example, requires the NAS study to assess latency periods between service or exposure to the risk factors and manifestation of the illness, *id.* § 101(c)(3), whereas the GWVA study does not expressly contain such a requirement. On the other hand, section 1603(f) of the GWVA requires the NAS to review separately, for various categories of illnesses, the available scientific data in order to identify empirically valid models of treatment for such illnesses, whereas the VPEA does not contain

such a requirement. Rather, section 101(f) of the VPEA merely calls on the NAS to make any recommendation it considers appropriate for additional scientific studies including, among others, "studies relating to treatment models." Additionally, although the lists of agents, hazards, and compounds to be covered in the initial NAS review in the two statutes are nearly identical, only the GWVA includes Uranium in the listing. *Id.* § 1603(d)(1)(F).

The foregoing disparities, however, clearly do not render the study requirements mutually exclusive or even radically divergent. Indeed, it appears that the identical or overlapping requirements of the studies called for by the respective bills may exceed their differences and that the respective study contracts could be drafted so that NAS's performance of one contract satisfies all the identical or overlapping requirements of the other contract.

You have also identified as a potential problem the statutory provisions concerning timing and submission of reports by the NAS. *See* VA Letter at 6–7. For example, the GWVA requires NAS to submit the first of its reports to the Secretaries of VA and Defense and to designated Senate and House Committees no later than 18 months after the date of enactment of that act (i.e., by April 21, 2000, which is 18 months after October 21, 1998), whereas the VPEA does not require the submission of the first of its required reports (to the VA Secretary and a different set of congressional committees) until *two years* after the Secretary and the NAS enter into the required agreement, a considerably later deadline. Again, the more accelerated timetable for submission of the report required by the GWVA presents no irreconcilable conflict between the two laws. It merely means that the portions of the VPEA study that overlap with those of the GWVA study must be completed by the latter's earlier deadline in order to comply with that statute. In that respect, the shorter GWVA deadlines may actually accelerate, rather than preclude, compliance with some requirements of the VPEA.

A final potential disparity that you have noted is the difference in the "sunset" provisions of the two laws: whereas section 101(j) of the VPEA provides for the termination of its provisions eleven years after the end of the fiscal year in which the VA enters into the agreement with the NAS, section 1603(j) of the GWVA provides for termination of its provisions ten years after the end of the fiscal year in which the NAS submits its first report. *See* VA Letter at 7. As in the case of the differing provisions for report submission deadlines, we do not believe these variations create any irreconcilable conflict between the statutes. For example, insofar as the two statutes impose overlapping or identical obligations or tasks that might be performed close to the "sunset" date of the earlier expiring statute, the existence of the differing sunset provisions does not appear to create a genuine or irreconcilable conflict. It merely means that if the VA is unable to complete such an overlapping task before the sunset of the statute with the shorter life it would still have authority to complete the task under the provisions of the statute with the longer duration. In that respect, the dual sunset provisions

may prove to supply an added element of flexibility in the completion of overlapping tasks authorized by both laws, rather than rendering any obligation under either statute impossible to perform.

## Conclusion

We conclude that section 1604 of the GWVA does not effectively nullify the later-enacted provisions of section 101 of the VPEA and that the Gulf War study and related provisions of the two statutes that the VA has asked us to analyze are not irreconcilable and are therefore valid and effective.

WILLIAM MICHAEL TREANOR
*Deputy Assistant Attorney General*
*Office of Legal Counsel*